[Crim. No. 8600.    Second Dist., Div. Three.    July 20, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. HENRY HEBERT, Defendant and Appellant.

Richard M. Moore, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, and William E. James, Assistant Attorney General, for Plaintiff and Respondent.

SHINN, P. J.—Henry Hebert was charged with the murder of Charles Swallow, pleaded not guilty, and after a trial by jury was convicted of involuntary manslaughter, a lesser included offense. Probation was denied and he was sentenced to the state prison. Defendant was represented by the Public Defender. Appeal is brought from the judgment in propria persona.

Defendant was a patron in a Venice bar, drinking beer but not intoxicated, when the victim entered at about 11 p.m. According to all the witnesses who testified on the subject, Swallow appeared to be either drunk or ill; the barmaid refused him service. He sat on a stool near defendant and an argument arose between them. It was established that defendant, while standing, hit Swallow in the face with his fist while Swallow was sitting on a bar stool, and that the assault was without sufficient provocation. When hit, the victim was knocked to the floor. Defendant testified that Swallow asked him for a quarter, which was refused, and Swallow said "All I done for you niggers, I can't get anything out of you"

and defendant said "That is where you are wrong, man." Swallow shoved him, put his hand into his coat pocket and said "I ought to cut your throat"; Swallow did not fall off the bar stool but that after he was hit another patron said "watch that knife," grabbed Swallow around the waist and pulled him off the stool. This other patron did not testify, nor was any knife found. No one actually saw Swallow fall, but several witnesses heard him fall. There was sufficient evidence to prove that the victim was knocked off the bar stool by the force of defendant's blows and that his head hit the wooden barroom floor with what one witness described as a loud "thud."

Officers arrived about 10 minutes later. Swallow was lying on the floor on his back, but apparently conscious. Officers assisted him to a sitting position and thought he was not seriously injured, but was intoxicated. They partly carried, partly dragged him to a patrol car and took him to the police station for booking for being intoxicated in a public place. Thelma McCord, the barmaid, testified that the two officers dragged Swallow from the place where he lay on the floor to the sidewalk; one officer lifted Swallow by holding onto his belt in the rear; the other lifted at his head; Swallow's feet were dragging; at the sidewalk the officers dropped him on his face; the drop was 12 to 14 inches; he was perfectly limp. The two officers testified that they partly carried, partly dragged Swallow to the sidewalk, sat him down in a sitting position and then laid him gently on his back; they did not drop him.

The officers arrived at the station with the victim about 35 minutes after the altercation. According to the officers, during the booking procedure and just after Swallow was searched and as he was standing with his hands high against a wall, he was observed to fall over backwards with his arms at his sides and "completely rigid as though a plank were falling"; his buttocks hit the floor first and then the back of his head; his head bounced about 6 inches off the floor and fell back, striking the floor a second time. The floor was concrete with an asphalt tile covering. Immediately after hitting the floor he started bleeding from one ear and within a few seconds from both ears. He was removed to a hospital where he died that morning.

The determinative question on the trial was whether defendant's act of striking decedent and knocking him to the floor was a proximate cause of death.

Dr. Kade, autopsy surgeon for the Los Angeles County Coroner's office, testified that there were three areas of injury to the head, each caused by a separate impact; one to the nasal area, causing a fracture of the nasal bones; one to the left of the skull, causing severe hemorrhaging; and a third to the right rear portion of the skull, causing additional fracturing and hemorrhaging. The nasal fracture was apparently due to the direct blows of defendant; the injury to the left rear of the skull was the most serious and the injury was more consistent with the decedent's having struck his head on the wooden barroom floor than with his falling and striking his head on the concrete floor at the police station. In the opinion of the witness, the injury to the left rear of the skull was received as the result of decedent's being knocked off the bar stool.[1] Both these injuries to the brain caused hemorrhaging, and either one, in Dr. Kade's opinion, would have resulted in a loss of consciousness. It was the opinion of Dr. Kade that the injury to the right side of decedent's head was caused at the police station when decedent suddenly lost consciousness and fell backward. The opinion of Dr. Kade was stated on cross-examination as follows: "In my opinion, death was caused by the two blows to the rear of the head. Whether the injury causing the fracture of the nasal bone would have been enough to cause death in and of itself, is difficult for me to establish, since there were these two additional injuries to the back of the head."

The witness was questioned further on cross-examination: "Q. You feel at this time, Doctor, that it is difficult for you to say that the damage to the nasal area and the front of the skull there, that that would have been sufficient in and of itself to have brought about death; is that right? A. Well, it is difficult to say because it is a conjectural question. It is like saying, if a boat is on fire and there is an explosion on board and the boat sinks would the fire have been enough to destroy the boat by itself had there not been an explosion. It is trying to infer what would have happened or could have happened if something else didn't happen. But the something else did happen and so I would be hesitant to conjecture about what could or might have happened under other circumstances." And when questioned further on cross-examination, he answered as follows: "Q. Well, when you stated

---

[1] This opinion was expressed after the witness had examined a picture of deceased as he lay on the floor at the police station.

earlier, Doctor, that you felt it would be speculative or conjectural for you to say that the damage to the front part of the skull was sufficient in itself to be fatal, did you mean that you felt it was conjectural, too conjectural or speculative for you to testify under oath that such damage could cause death in and of itself? A. No, I did not. It is my opinion that it easily could have, but I did not wish to state it as an absolute certainty that it would have definitely and unequivocally have caused death as an inevitable result in and of itself. It is my opinion that the greatest likelihood, the greatest medical probability is that it would have been sufficient to cause death. But I hesitate to state it as an absolute certainty.''

The statement of the doctor that death resulted from the blows on the rear portions of the skull is clear enough. His opinion with respect to the probable consequences of the blow which fractured the nasal bones was an expression of his belief that the blow ''easily could have'' and that according ''to the greatest medical probability'' would have been sufficient to cause death. The force of this opinion was not destroyed by the stated qualification that he was not saying that death would have been the inevitable result of the blow or would have followed as an absolute certainty. The opinions expressed with respect to the probable consequences of the blow to the face, considered with the opinion that the major brain hemorrhage resulted from the fall on the barroom floor left no doubt that the opinion of the doctor was that the injuries in the barroom were probably fatal.

■ The evidence of the several injuries, the blow to the face, the fall in the barroom, the incident on the sidewalk and the fall in the police station presented the critical question as to the proximate cause of the death.

Upon this issue the primary factual question was whether the injuries received in the barroom would have resulted in death. Defendant was responsible for all the injuries inflicted in the barroom and if the jury had found those injuries to have been so severe as to have resulted in death the fact that other injuries were suffered later would have been immaterial. The only support for a finding of the jury that the injuries in the barroom were fatal would have been the opinion expressed by Dr. Kade. The jury was not required to give full effect to his opinion, and could have doubted that the fatal injuries were suffered in the barroom incident.

■ It is of common knowledge that a blow which causes a broken nose does not ordinarily cause death. The picture of

deceased taken at the police station merely showed him lying on his back with his head on the floor. There was evidence that his head bounced after hitting the floor. It was a matter of pure speculation which side of the skull hit the floor first. Moreover, the opinion of the doctor that the most serious fall was the one in the barroom was inconsistent with the fact that it was the fall in the police station that caused immediate bleeding from both ears. If it was doubted that the first injuries would have produced a fatal result and that death would have resulted despite the injuries received in the police station, the question necessarily arose whether defendant was responsible for the consequences of the later fall. It was, therefore, vitally important that the jury be adequately and correctly instructed on the doctrine of proximate cause.

The court instructed that in order to find the defendant guilty of either murder or involuntary manslaughter the jury must find that the injury inflicted by defendant was a proximate cause of the death and that ''The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury.''

The court also instructed as follows: ''You are instructed that to be a legal cause of death, a defendant's act must be its proximate cause  not merely its possible cause. A defendant's act may be considered the proximate cause of the death of another though it is not the immediate cause, if it is the ultimate cause. But where there is a supervening cause the defendant's act cannot be considered a proximate cause. The fact, if it be a fact, that the deceased or some other person or persons were guilty of negligence, which was a contributory cause of the death involved in the case, is not deemed to be a supervening cause and is no defense to a criminal charge if the defendant's own conduct was a proximate cause of the death.'' We are of the opinion that these instructions were wholly inadequate.

It has been the practice for many years to instruct in the language of the first quoted instruction, but we do not believe it was a satisfactory or sufficient instruction to give in the present case where the question of proximate cause was an intricate and difficult one to be resolved by the jury. We do not say the instruction misstates the law, but only that in

the present case it was unclear and confusing as a statement of the doctrine of proximate cause. The instruction appears to have had its origin in the edition of Shearman and Redfield on Negligence published in 1888 which used the term "natural and continuous sequence." The term appeared in later editions of Shearman and Redfield, at least down to the 1941 edition, but as early as 1870 the authors stated: "But the practical construction of 'proximate cause' by the courts, is a cause from which a man of ordinary experience and sagacity could foresee that the result might probably ensue."

As stated by Prosser, second edition, page 266: "The defendant ordinarily will not be relieved of liability by an intervening cause which could reasonably have been foreseen, nor by one which is a normal incident of the risk created. The defendant will ordinarily be relieved of liability by an unforseeable and abnormal intervening cause which produces a result which could not have been foreseen."

There have been many attempts to phrase an all-purpose definition of proximate cause, but we think that in ordinary circumstances all the definitions have had their roots in the doctrine of foreseeability. We think the jury should have been instructed in clear and simple language as to the measure of the responsibility of defendant for the acts which caused Swallow's death. He was responsible not only for the injuries inflicted in the barroom, but for any later injuries to Swallow that were reasonably foreseeable, and which he would not have sustained if in a normal condition. The issue here was clear-cut and vital and should have been submitted to the jury upon the test of foreseeability. Instead of being submitted in this simple form, the issue was confused by the use in the first instruction of the terms "natural and continuous sequence," "efficient intervening cause" and "necessarily sets in operation the factors that accomplish the result." And in the second quoted instruction, we find "superseding cause" added. The jury was given no definition of "efficient intervening cause" or "supervening cause." These are vague and confusing terms, at best, and the jury should not have been left to guess at their meaning and their application to the facts. What test was the jury to apply in determining their meaning? Do the terms "intervening" and "supervening" mean the same thing, or have they different meanings? What would be an "efficient intervening cause" or "supervening cause" that would break

the chain of causation? Would the chain remain unbroken even though the later event was one that was extraordinary and unpredictable? The instructions did not answer these questions.

We cannot doubt that in an effort to understand the full purport of the instructions the minds of the jurors would have been distracted from the question of foreseeability of future injury. They were told to look for an "efficient intervening cause" or a "supervening cause" as if it made no difference whether after-occurring causes were reasonably foreseeable. The fall in the police station, judged from appearances, was extremely serious, as evidenced by the bleeding from both ears. The jury could well have believed that except for that fall death would not have occurred. Of course, the question was not whether that particular event might occur, but whether any serious injury was likely to occur because of Swallow's condition. Defendant had a duty to anticipate the common and ordinary consequences of his act, and these he was responsible for. They could be said to be the direct consequences. But the fall in the police station could have been found to be an extraordinary and abnormal occurrence, not reasonably foreseeable as a result of the first injuries. The failure of the court to instruct that defendant would have been responsible for the consequences of the injuries received after Swallow was taken from the barroom only if further injury was reasonably to be anticipated, and the giving of instructions that enabled the jury to hold him responsible for later injuries even if the same were not reasonably foreseeable was prejudicial and reversible error.

The judgment is reversed.

Ford, J., and Files, J., concurred.