[No. A102620. First Dist., Div. Three. June 2, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANKLIN NEAL BRADY et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II.A.4., and II.B.

COUNSEL

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant Franklin Neal Brady.

Candace Hale, under appointment by the Court of Appeal, for Defendant and Appellant Richard Carkeek Mortensen.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and William Kuimelis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

POLLAK, J.—Defendants Franklin Neal Brady and Richard Carkeek Mortensen were accused of causing the deaths of two firefighter pilots who collided when responding to a fire that broke out near defendants' methamphetamine laboratory in a wooded area of Mendocino County. They were tried jointly on various charges, including murder, manufacturing and conspiracy to manufacture methamphetamine with special allegations that their illegal acts caused two deaths, and recklessly causing a fire that resulted in the death of the firefighters.

Mortensen was convicted only of manufacturing and conspiring to manufacture methamphetamine. He appeals on the grounds that there is no substantial evidence to support the conviction and that the court improperly admitted evidence of a prior conviction for manufacturing methamphetamine. Brady was convicted of recklessly starting a fire that caused the deaths of the pilots and of manufacturing and conspiracy to manufacture methamphetamine. His primary contention on appeal is that the jury instructions and the exclusion of four categories of evidence precluded the jury from properly determining whether his conduct proximately caused the death of the pilots. He also contends that the trial court improperly removed six potential jurors for cause based on their stated inability to follow the court's incorrect instructions on proximate cause. In a supplemental brief, Brady contends that the trial court also erred in failing to instruct the jury that it must unanimously agree which activity constituted the manufacture of methamphetamine. In the published portion of this opinion, we address only the issues relating to proximate and superseding causation.

We affirm the judgment in all respects.

### Factual and Procedural History

Brady and Mortensen were charged by information with the murder of Lawrence Groff (count one, Pen. Code, § 187, subd. (a)); the murder of Lars Stratte (count two, Pen. Code, § 187, subd. (a)); manufacturing methamphetamine with special allegations that Groff and Stratte suffered great bodily injury and death during the commission of the offense (count three, Health & Saf. Code, §§ 11379.6, subd. (a), 11379.9, subd. (a)); recklessly setting a fire to a structure or forest land that caused the deaths of Groff and Stratte with special allegations that Groff and Stratte were killed while employed to suppress that fire (count four, Pen. Code, §§ 452, subd. (a), 452.1, subd. (a)(2)); and conspiracy to manufacture a controlled substance with the following overt acts: both defendants purchased chemicals to be used in manufacturing methamphetamine, transported and/or stored chemicals to be

used in the process of manufacturing methamphetamine, and entered a trailer for the purpose of manufacturing methamphetamine (count five, Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, § 11379.6, subd. (a)).

The following evidence was presented at trial:

At approximately 3:00 p.m. on August 27, 2001, a forest fire was reported in a wooded area of Mendocino County just south of Ukiah. Because of the remote location, air support was required to control the fire. California Department of Forestry and Fire Protection (CDF) officer James Davis supervised nine air tankers and three helicopters fighting the fire. Pursuant to CDF protocol, the air tankers carrying fire retardant flew counterclockwise at an altitude of 1,000 to 1,5000 feet until they reached the fire, and then descended to approximately 200 feet as they approached the drop site.

About 6:40 p.m., after pilot Groff had completed six successful drops and Stratte had made five successful drops, Groff's plane collided with Stratte's plane. CDF Officer James Wattenburg, who was on the ground at the time of the collision, reported seeing Stratte's plane flying in pattern and then descending for its drop when a third plane approached from the wrong direction and collided with his plane. Other witnesses confirmed that Groff's plane was flying very low, below the tree line, and in the opposite direction than the other planes had been flying. Neither pilot survived the collision.

CDF Officer Jim Robertson was the first firefighter to reach the site where the fire started. When he arrived he saw a trailer that had almost burnt to the ground. The flames coming from the trailer were blue, green and orange. Other officers reported seeing purple and yellow colored smoke coming from the trailer. Neighbors Chris Fisher and Jennifer Provost were at the scene when Robertson arrived. Fisher testified that when he arrived at the scene the trailer was not on fire but that it burst into flames a few minutes later. He told Robertson that he thought people had been cooking methamphetamine in the trailer. Provost testified that she stopped at the scene because she saw a grass fire in a 20-foot wide oval about 10 feet from the trailer. Brady was there and asked for help, so she went home to get water. When she returned, the trailer was on fire and Brady was gone. Provost told Robertson that she had seen a black jeep leaving the scene of the fire. Robertson put out a radio bulletin for officers to be on the lookout for a possible arson suspect driving a black jeep.

CDF Officer Larry Grafft heard the radio bulletin and responded to a location on Highway 101 where the black jeep had been pulled over. Brady had been riding in the jeep with Mortensen. Brady told Grafft that he had started the fire in the fire ring outside the trailer to boil water for a sitz bath for his hemorrhoids, but that burning paper blew out of the fire ring and the

fire "took off." He tried to fight the fire with a shovel and water but left when the water ran out. Brady was arrested on suspicion of arson, but Mortensen was released. After Brady's arrest, Grafft responded to the fire scene where he found the camping ring, a washtub, and a shovel without a handle. The area was still smoking and there were pink and blue flames inside the trailer.

The officers determined that defendants were likely manufacturing methamphetamine at the trailer, and Mortensen was arrested later that night at Brady's house. The arresting officer searched Brady's house pursuant to a search warrant and found a glass containing a mixture of acetone and methamphetamine in the freezer. In a box in a bedroom he also found three pipes and suspected methamphetamine residue. In Mortensen's black jeep the officer found store receipts dated August 26 and 27 for one gallon of acetone, four gallons of denatured alcohol, one pair of leather gloves, three 5-gallon buckets, and plastic tubing.

A toxicologist testified that a sample of Mortensen's blood, taken after his arrest, tested positive for a large quantity of methamphetamine, indicating that he was a regular user. Brady's blood also tested positive for methamphetamine, albeit for a much smaller concentration.

CDF Officer Ceriani, an expert on the use of solvents and accelerants in the investigation of wildfires, investigated the fire on August 27. Ceriani identified one point of origin of the fire in or around the firepit outside the trailer. He did not go into the trailer because it appeared to have been a methamphetamine laboratory and he requested the Mendocino Major Crimes Task Force to investigate. He opined, however, that the trailer must have burned at a higher than normal temperature to cause the damage he observed, and that a sudden ignition of a large quantity of accelerants likely caused a pressure wave that pushed the windows out of the trailer.

Task Force Officer Robert Nishiyama investigated the fire scene and testified as an expert in the recognition of methamphetamine laboratories. He explained how glass laboratory equipment found inside the trailer is used to manufacture methamphetamine. Nishiyama also reported finding three heating mantles in the trailer. Although a number of the members of the family of Joe Edelman, who owned the trailer, testified that the trailer did not have electricity and that the generators had not worked for years, Nishiyama identified wires that may have been connected to the heating mantles and a power strip next to the mantles with what appeared to be remnants of plugs and wires leading into it. Nishiyama also found a Coleman camp stove and Coleman fuel in and around the trailer. Finally, he testified that the liquid mixture found in Brady's freezer was evidence of a finished "cook" because the dirty methamphetamine is washed in acetone at the end of the ephedrine

reduction manufacturing process. Based on this evidence, Nishiyama believed the trailer was an operational laboratory and not merely a storage facility.

Mathew Kirsten, a California Department of Justice criminalist, also investigated the fire. He tested personal items taken from defendants after their arrest and found traces of methamphetamine and ephedrine on their clothing. He confirmed that the liquid mixture found in Brady's freezer contained methamphetamine manufactured by the ephedrine reduction process. He also explained that purple smoke from the fire is consistent with burning iodine, which is used in the manufacture of methamphetamine. In his expert opinion, based on Mortensen's recent purchases, the large quantity of glassware, and the fact that a flask was sitting on a heating mantle, the trailer housed an operational methamphetamine laboratory.

Officer Mark McNelly, a special agent with the Mendocino Major Crimes Task Force at the time of the fire, also examined the burnt-out trailer. Based on the placement of the glassware that he found, he also believed the trailer was an operational lab, not merely a storage facility.

Brady testified that during the summer of 2001, he had gone to the trailer approximately six times to help Edelman clean the area to prepare it for sale. Sometime in August 2001, Mortensen had come to the trailer with Brady, and Brady had suggested that he store his lab equipment there. Brady knew that the equipment was used for making methamphetamine.

On August 26, 2001, Brady and Mortensen went to several stores, where Mortensen bought duct tape, a hose, denatured alcohol, and acetone. Brady assumed that Mortensen was buying the materials to manufacture methamphetamine. That night they drove to the Edelman property and spent the night. The following morning Mortensen put his glassware and recent purchases in the trailer. Later that afternoon, Brady started a fire in the fire ring to boil water for a sitz bath because his hemorrhoids were bleeding.[1] After unsuccessful attempts to build the fire, Brady threw a piece of wood on some burning paper. Sparks flew from the fire ring and nearby dry grass caught fire. Brady tried unsuccessfully to stomp out the grass fire. He and Mortensen tried to extinguish the fire with the water for his bath, a shovel and cans of soda, but they gave up when the fire grew too big and crossed the road.

Brady admitted that he had been convicted in 1996 of the crime of possession of methamphetamine with the intent to distribute.

---

[1] Brady's doctors and relatives testified that Brady had a history of hemorrhoidal problems and that he had taken sitz baths to soothe his hemorrhoids in the past. Kirsten, however, testified that he had not seen any blood on the underwear that was collected from Brady after his arrest.

Mortensen also testified at trial. He explained that he had been storing his laboratory equipment in Lodi but needed to move it, and Brady suggested he store the equipment in the trailer. He had made two prior trips to the trailer to store the equipment. On the morning of August 27, he and Brady went to the trailer to store some additional equipment. Later in the day, he fell asleep on a couch. When he awoke, he saw smoke near the trailer and Brady told him to get some water. They tried to fight the fire but it grew too big. Mortensen went back to the Edelman house and called 911. Then they left.

Mortensen acknowledged that he had purchased denatured alcohol, buckets and hoses the day before, and explained that he purchased the items because he "was getting ready to . . . do a trip" or cook methamphetamine. However, he had no intention of manufacturing methamphetamine in the trailer because it had no electricity, no running water and no functioning gas stove. He also acknowledged buying the acetone the day before the fire, but explained that he did so to clean some dirty methamphetamine he had purchased. He cleaned his drugs and stored the excess acetone in Brady's freezer prior to going to the trailer. Mortensen also admitted that he had manufactured methamphetamine at his home in El Sobrante as recently as 1999.

Brady's live-in girlfriend, Carolyn Roseborough, confirmed that Mortensen had visited their house on Sunday, August 26, and that he and Brady left for the trailer that evening after dinner.

Donald Lykins, a retired pilot and aircraft accident investigator, testified that the normal pattern for tankers is to fly in a counterclockwise pattern, at an altitude of about 3,000 feet, circling left until the supervising plane gives the drop signal. Then they descend, drop the fire retardant and exit low to avoid the other planes. He opined that Groff's plane entered the pattern abnormally, flying too low and in the wrong direction.

Michael Padilla, the CDF chief of aviation, testified that aircraft accidents while fighting wildfires are not unusual in California. In the past 40 years, there have been a total of 30 deaths of aircraft personnel fighting fires in California. However, there had been only one other midair collision of two CDF airplanes in the last 40 years.

Cyrillis Holmes, an arson investigator, examined the reports and evidence of the fire and concluded that the fire started in or around the fire ring. He also testified that the woodland fire was not caused or accelerated by the trailer burning. By the time the trailer caught fire, the woodland fire had spread beyond it.

At the conclusion of the trial, the prosecutor amended the complaint to state an additional cause of action for a violation of Penal Code section 452,

subdivision (c), unlawfully causing a fire of a structure or forest land. After the jury had deliberated for six and one-half days, a juror was dismissed for misconduct. When an alternate juror was substituted, the jury deliberated for an additional three days. Ultimately, the jury found both defendants not guilty of the murders of Groff and Stratte, guilty of manufacturing and conspiring to manufacture methamphetamine, and not true the allegation that Groff and Stratte suffered great bodily injury and death during the commission of that offense. The jury found Brady, but not Mortensen, guilty of recklessly starting a fire that caused the death of the two pilots.[2]

The court sentenced Brady to a total of 13 years eight months in prison and Mortensen to seven years in prison. Both defendants filed timely notices of appeal.

Discussion

## I. Mortensen's Appeal[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. Brady's Appeal

Brady's primary arguments relate to whether his conduct in starting the fire proximately caused the deaths of the two pilots. He argues that the intervening acts of the pilot Groff and others were superseding causes that absolved him of responsibility for the two deaths. We first address Brady's proximate cause issues, and then turn to the remaining issue concerning the court's failure to give a unanimity instruction.

### A. Proximate Cause

Brady contends that the trial court's instructions and exclusion of evidence precluded the jury from properly determining the issue of proximate cause. He contends: "(a) The intentional act of the deceased, or other third party, could constitute a defense if it were unforeseeable. (b) A natural cause, such as pilot incapacitation, could constitute a defense if it were unforeseeable. (c) The negligent act of the deceased could constitute a defense if that act were both extraordinar[ily] negligent and unforeseeable. (d) The negligent act of a third person, other than the deceased, could constitute a defense if it were

---

[2] The jury also found Brady guilty on the added count of unlawfully starting a fire of a structure or forest land, but this count was subsequently dismissed as a lesser included offense of recklessly starting a fire that caused the two deaths.

[*] See footnote, *ante*, page 1314.

unforeseeable." Although Brady properly emphasizes the role of foreseeability in determining proximate cause, or the scope of his liability, we do not agree that the foreseeability of the fatal collision was improperly submitted to the jury in this case.

### 1. *Defining Proximate Cause*

■ "The principles of causation apply to crimes as well as torts. [Citation.] 'Just as in tort law, the defendant's act must be the legally responsible cause (*"proximate cause"*) of the injury, death or other harm which constitutes the crime.' " (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46–47 [51 Cal.Rptr.2d 185] (*Schmies*).) So too, California criminal law relies on civil law formulations of concurrent and superseding cause. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 855 [111 Cal.Rptr.2d 129, 29 P.3d 209] (conc. opn. of Kennard, J.) [citing *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9 [34 Cal.Rptr.2d 607, 882 P.2d 298], for definition of superseding cause]; *People v. Roberts* (1992) 2 Cal.4th 271, 315–320 [6 Cal.Rptr.2d 276, 826 P.2d 274] [discussing similarities between analysis of causation in *Palsgraf v. Long Island R.R. Co.* (1928) 248 N.Y. 339 [162 N.E. 99] and the natural and probable consequences doctrine applicable in criminal law]; *Schmies, supra,* 44 Cal.App.4th at p. 49 [relying on the Rest.2d Torts, § 442A, p. 468, for definition of superseding cause].)

■ " '[T]he law defines "cause" in its own particular way.' " (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1053 [1 Cal.Rptr.2d 913, 819 P.2d 872].) A "cause of [death] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur." (CALJIC No. 3.40.) In *People v. Roberts, supra,* 2 Cal.4th 271, the Supreme Court emphasized the primary significance of foreseeability to proximate cause. "The object of the criminal law is to deter the individual from committing acts that injure society by harming others, their property, or the public welfare, and to express society's condemnation of such acts by punishing them. 'The purpose of the criminal law is to define socially intolerable conduct, and to hold conduct within . . . limits . . . reasonably acceptable from the social point of view.' [Citation.] 'Modern penal law is founded on moral culpability. The law punishes a person for a criminal act only if he is morally responsible for it. To do otherwise would be both inhumane and unenlightened. As was said in *Holloway v. United States* [(1945)] 80 U.S.App.D.C. 3, 5 [148 F.2d 665, 666], "Our collective conscience does not allow punishment where it cannot impose blame." ' " (*People v. Roberts, supra,* at p. 316.) "The criminal law thus is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of

the defendant's act. . . . Moreover, if one aim of the criminal law is to punish in proportion to moral culpability, little purpose is served by imposing the same punishment for direct but remote consequences of a violent act as for natural and probable direct consequences." (*Id.* at pp. 319–320.) Thus the court concluded, "A result cannot be the natural and probable cause of an act if the act was unforeseeable." (*Id.* at pp. 321–322.)

■ "In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' " (*Schmies, supra,* 44 Cal.App.4th at pp. 48–49.) If an intervening act, event or force is present, however, it is necessary to determine whether that act, event or force is sufficient to absolve the defendant of liability "because the 'defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 866–867 [111 Cal.Rptr.2d 148, 29 P.3d 225]; see *People v. Sanchez, supra,* 26 Cal.4th at p. 847 [" ' "There may be more than one proximate cause of the death. When the conduct of two or more persons *contributes concurrently as the proximate cause of the death,* the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result" ' "].)[6]

■ "In law, the term 'superseding cause' means 'an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible.' " (*People v. Sanchez, supra,* 26 Cal.4th at p. 855 (conc. opn. of Kennard, J.).) " 'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. ". . . If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." ' " (*People v. Cervantes, supra,* 26 Cal.4th at p. 871; see also *Schmies, supra,* 44 Cal.App.4th at pp. 49–50.) ■ " '[W]here [an] injury was brought about by a later cause of independent origin . . . [the question of proximate cause] revolves around a determination of whether the later cause

---

[6] In *Sanchez,* the court held that the defendant's act of engaging a third party in a gunfight was a concurrent and thus proximate cause of the victim's death even if the third party actually shot the victim. (*People v. Sanchez, supra,* 26 Cal.4th at pp. 848–849.) The court did not even consider whether the third party's intentional act of returning the defendant's fire could be regarded as a superseding cause of the victim's death. (*Id.* at pp. 840, 844, 848–849.) Plainly it could not because it was both dependant on defendant's initial act and entirely foreseeable. (*Id.* at pp. 854–855 (conc. opn. of Kennard, J.).)

of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable. If *either* of these questions is answered in the affirmative, then the defendant is not relieved from liability towards the plaintiff; if, however, it is determined that the intervening cause was not foreseeable *and* that the results which it caused were not foreseeable, then the intervening cause becomes a supervening cause and the defendant is relieved from liability for the plaintiff's injuries.' " (*Pappert v. San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 210 [186 Cal.Rptr. 847].) Thus, "[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*People v. Crew* (2003) 31 Cal.4th 822, 847 [3 Cal.Rptr.3d 733, 74 P.3d 820]; see also *People v. Hebert* (1964) 228 Cal.App.2d 514, 520 [39 Cal.Rptr. 539], quoting Prosser on Torts (2d ed. 1955) p. 266 [" 'The defendant will ordinarily be relieved of liability by an unforeseeable and abnormal intervening cause which produces a result which could not have been foreseen' "].)

 "[T]here is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the jury, though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus." (*People v. Roberts, supra,* 2 Cal.4th at p. 320, fn 11.)

*Schmies, supra,* 44 Cal.App.4th 38 is instructive. In *Schmies,* the defendant was convicted of vehicular manslaughter with gross negligence and reckless driving causing great bodily injury. The conviction arose out of an incident in which the defendant engaged two California Highway Patrol (CHP) officers in a high-speed chase, during which one of the officers crashed into another car killing the driver. On appeal, defendant challenged the trial court's exclusion of evidence that the officer unreasonably violated CHP chase guidelines. In upholding the exclusion of this evidence, the court reiterated that " '[i]t has been repeatedly held that contributory negligence is not available as a defense or excuse for crime.' [Citation.] The conduct of the victim or other third persons, whether negligent or even criminally proscribed, is not, in itself, a defense to crime." (*Id.* at p. 46.) Accordingly, evidence of the unreasonableness of the officers' conduct was not relevant because the negligence of the officers was not a defense to the charges against the defendant. "The fact that the officers may have shared responsibility or fault for the accident does nothing to exonerate defendant for his role." (*Id.* at p. 51.) The relevant question was "whether defendant realized or should have realized that the CHP officers would pursue his fleeing motorcycle. . . . The test, as we have recounted, is not whether the officers acted reasonably but rather whether defendant realized or should have realized that the officers would respond as they did." (*Id.* at p. 55.) Thus, the court concluded that

"[t]he task of the jury is to determine whether the officers' response was so extraordinary that it was unforeseeable, unpredictable and statistically extremely improbable." (*Id.* at p. 56.)

## 2. Jury Instructions on Proximate Cause

The trial court gave the following instructions to the jury regarding causation: CALJIC No. 3.40, in part: "The criminal law has its own particular way of defining cause. A cause of death or great bodily injury is an act or acts that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or acts the death or great bodily injury and without which the death or great bodily injury would not occur."

Court's Instruction Number 2: "A direct, natural and probable consequence is a consequence which is normal and is a reasonably foreseeable result of the original act. The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen. It is enough if the possibility of some harm of the kind which resulted from the act was foreseeable."

CALJIC No. 3.41: "There may be more than one cause of the deaths of Lawrence Groff and Lars Stratte. When the conduct of two or more persons contributes concurrently as a cause of the deaths, the conduct of each is a cause of the deaths if that conduct is also a substantial factor contributing to the result. A cause is concurrent if it is operative at the moment of the death and acted with another cause to produce the death. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person, even the deceased person, contributed to the death."

Court's Instruction Number 5: "An intervening act may be so disconnected and unforeseeable as to be a superseding cause that, in such a case, the defendant's act will be regarded at law as not being a cause of the injuries sustained."

CALJIC No. 8.56: "It is not a defense to a criminal charge that the deceased or some other person was guilty of negligence, which was a contributory cause of the death involved in the case."

Brady argues that the statement in CALJIC No. 3.41, that "it is no defense that the conduct of some other person, even the deceased person, contributed

to the death," and the whole of CALJIC No. 8.56, conflict with the court's instruction No. 5. The former instructions, he asserts, precluded the jury from finding that Groff's conduct was a superseding cause that eliminated his responsibility for the air collision. As discussed above, however, a defendant whose conduct was a proximate cause of harm is not absolved of responsibility because another person's conduct, negligent or otherwise, is also a substantial or contributing factor in causing the harm. The act of another constitutes a superseding cause precluding responsibility of the initial actor only if the other's conduct is both unforeseeable and causes harm that was not the foreseeable consequence of the initial actor's conduct. In this regard, CALJIC Nos. 3.41 and 8.56 and instruction No. 5 provide accurate statements of the law. (See *People v. Bland* (2002) 28 Cal.4th 313, 338 [121 Cal.Rptr.2d 546, 48 P.3d 1107] [CALJIC Nos. 3.40 and 3.41 correctly define proximate cause where evidence suggests more than one cause of injury].)

Although additional clarity might have been helpful, Brady did not object to the instructions on this ground or propose a modification to clarify these instructions. He objected to CALJIC No. 8.56 only on the ground that it is incorrect, an argument properly rejected by the trial court. There is no CALJIC instruction on superseding cause, so that the trial court was compelled to look elsewhere and utilized substantially the same instructions that were used and approved in *Schmies,* including instruction No. 5. (See *Schmies, supra,* 44 Cal.App.4th at p. 50, fn. 7.) We agree with Brady that a preferable formulation of the proximate cause instructions when an intervening cause is at issue is now found in the Judicial Council's California Civil Jury Instructions (2003), CACI Nos. 431 and 432. These instructions provide, "A person's negligence may combine with another factor to cause harm. If you find that [name of defendant]'s negligence was a substantial factor in causing [name of plaintiff]'s harm, then [name of defendant] is responsible for the harm. [Name of defendant] cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [name of plaintiff]'s harm." (CACI No. 431.) "[Name of defendant] claims that [he/she/it] is not responsible for [name of plaintiff]'s harm because of the later misconduct of [insert name of third party]. To avoid legal responsibility for the harm, [name of defendant] must prove all of the following: [¶] 1. That [name of third party]'s conduct occurred after the conduct of [name of defendant]; [¶] 2. That a reasonable person would consider [name of third party]'s conduct as a highly unusual or an extraordinary response to the situation; [¶] 3. That [name of defendant] did not know and had no reason to expect that [name of third party] would act in a negligent/wrongful] manner; and [¶] 4. That the kind of harm resulting from [name of third party]'s conduct was different from the kind of harm that could have been reasonably

expected from [name of defendant]'s conduct." (CACI No. 432.)[7] While these instructions undoubtedly would have provided greater clarity, they confirm the substantive accuracy of the rules of law contained in the instructions the court gave.

■ Brady now suggests that instruction No. 5 was inadequate because it failed to define "disconnected," and that if disconnected means having no relationship to his act the instruction was incorrect. "The law is settled that when terms have no technical meaning peculiar to the law, but are commonly understood by those familiar with the English language, instructions as to their meaning are not required." (*People v. Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) "Disconnected" as used in the court's instruction has no technical meaning. Moreover, its common meaning— "having no connection (with something else)" or being "not well-connected" (Oxford English Dict. (2d. ed. 1998) <http://www.oed.com> [as of June 2, 2005])—when read in conjunction with the rest of the sentence, is not inconsistent with the law of proximate cause. (See *People v. Harris* (1975) 52 Cal.App.3d 419, 428, fn. 4 [125 Cal.Rptr. 40] [intervening conduct must be "so remote or disconnected and unforeseeable" to be superseding cause].)

The instructions as a whole properly focused on whether the deaths of the two firefighters were reasonably foreseeable consequences of recklessly setting the fire in the woods. Under CALJIC No. 3.40, Brady was not guilty unless the deaths resulted as "a direct, natural and probable consequence" of his conduct, that is, under the court's instruction No. 2, as the "normal and . . . reasonably foreseeable result of the original act."

■ The court's failure sua sponte to define "disconnected" caused no confusion similar to that found in *People v. Hebert, supra*, 228 Cal.App.2d at pages 519–521, upon which Brady relies. In *Hebert*, the instructions told the jury that "in order to find the defendant guilty of either murder or involuntary manslaughter the jury must find that the injury inflicted by defendant was a proximate cause of the death and that 'The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any

---

[7] As Brady notes, the Sources and Authorities to CACI No. 432 acknowledge that much of the instruction is based on section 447 of the Restatement Second of Torts. Section 447 confirms that "[t]he fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if [¶] . . . [¶] (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent." (Rest. 2d Torts, § 447.)

As discussed in part 3.a., *post,* the concept of a superseding cause may be subsumed within the concept of proximate causation, which does not extend liability to unforeseeable consequences. CACI No. 432, it should be noted, makes no use of the term "superseding cause."

efficient intervening cause, produces the injury, and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury.' " The court also instructed that " 'to be a legal cause of death, a defendant's act must be its proximate cause not merely its possible cause. A defendant's act may be considered the proximate cause of the death of another though it is not the immediate cause, if it is the ultimate cause. But where there is a supervening cause the defendant's act cannot be considered a proximate cause. The fact, if it be a fact, that the deceased or some other person or persons were guilty of negligence, which was a contributory cause of the death involved in the case, is not deemed to be a supervening cause and is no defense to a criminal charge if the defendant's own conduct was a proximate cause of the death.' " (*Id.* at p. 519.) The trial court failed to define "efficient intervening cause" or "supervening cause" (*id.* at p. 520), and the appellate court concluded that "in an effort to understand the full purport of the instructions the minds of the jurors would have been distracted from the question of foreseeability of future injury. They were told to look for an 'efficient intervening cause' or a 'supervening cause' as if it made no difference whether after-occurring causes were reasonably foreseeable." (*Id.* at p. 521.) In the present case, however, the court's instructions did focus on the need to determine whether the deaths of the two firefighters were the reasonably foreseeable consequences of Brady's conduct, rather than disconnected happenings. The failure to define "disconnected" did not distract the jury from the ultimate question of whether the deaths were caused by a chain of events that was the "direct, natural and probable consequence" of Brady's conduct.

*People v. Roberts, supra,* 2 Cal.4th 271, another case on which Brady relies, is to the same effect. In *Roberts,* the defendant was charged with the murder of a prison guard. Defendant had stabbed a fellow inmate named Gardner, who chased him up a flight of stairs and ultimately stabbed and killed the guard at the top of the stairs. (*Id.* at pp. 294–295.) The jury was instructed that if defendant caused Gardner to lose his faculties and stab the guard while in a state of delirium or a similar state of unconsciousness, it was immaterial that Gardner's conduct was unforeseeable. (*Id.* at p. 315.) The court held that the jury could properly find that the defendant's stabbing of Gardner was the proximate cause of the murder of the guard. "It is foreseeable that a wounded inmate might try to arm himself with a weapon abandoned at the scene of a prison melee and pursue his attackers a short distance." (*Id.* at p. 321.) Nonetheless, the court reversed the conviction on the ground that "the instruction incorrectly stated the law of proximate cause. A result cannot be the natural and probable cause of an act if the act was unforeseeable. [Citation.] An instruction that told the jury to disregard foreseeability would inevitably lead it to ignore the nature of Gardner's response to defendant's attack, and hence would substantially distract the jury

from considering the causation element of the offense—an element that was very much at issue in the case." (*Id.* at pp. 321–322.) As in *Roberts*, the important question in the present case is whether an in-flight collision of aircraft attempting to extinguish a fire Brady recklessly set in the woods was foreseeable to a reasonable person in Brady's position. Unlike the situation in *Roberts*, this question was fairly put to the jury.

Moreover, any need for amplification was provided by the closing arguments of the attorneys. The prosecutor explained, "All that needs to be shown for foreseeability, to hold the defendants accountable [is] that they could foresee this type of harm, is that a possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen. According to the law, it is enough if the possibility of some harm of the kind which resulted from the act was foreseeable." Mortensen's attorney elaborated further. "There are two steps that you have to go through in order to find causation. . . . First you have to realize that there is an intervening event that was the immediate cause of the pilots' deaths, and that was the midair collision. It was not the fire. The pilots did not die by fire, by smoke inhalation, by anything directly connected with the fire itself. . . . [¶] . . . [S]ince there is the intervening act it's called, the intervening event, the collision, you have to determine first of all whether or not that collision was foreseeable to someone in the defendants' position, a reasonable person starting a fire . . . . [¶] The second step is if it was foreseeable, reasonably foreseeable, something that someone would have considered, then was there causation . . . was the collision a direct causal result . . . of the fire. In other words, . . . did the fire have . . . anything to do with this collision?" Thus, both attorneys focused the jury's attention on the critical question of whether the deaths of the two firefighters responding to the fire that Brady started were reasonably foreseeable consequences of setting the fire. Both arguments were consistent with the court's instructions. The issue was properly framed for the jury's determination.

3. *Excluded Evidence*

Brady does not dispute that there is substantial evidence to support the finding that the deaths of the two firefighters was a foreseeable consequence of what the jury found to be his reckless conduct in setting the fire.[8] He does contend, however, that the trial court improperly excluded four categories of evidence based on which the jury could have found an unforeseeable superseding cause absolving him of responsibility for the two deaths: evidence that Groff committed intentional misconduct by flying with a blood-

---

[8] In arguing foreseeability to the jury, Brady's attorney acknowledged that the death of a single aircraft pilot engaged in fighting a forest fire is a reasonably foreseeable consequence of starting such a fire, but urged that a midair collision killing two pilots is far more unlikely and thus unforeseeable.

alcohol level in excess of the limit permitted by the Federal Aviation Administration (FAA); evidence that Groff became physically and/or mentally incapacitated due to natural causes during the flight; evidence that Groff failed to make required radio contact prior to entering the orbit of the other airplanes; and evidence that the accident was caused by the negligent maintenance of Groff's airplane. Substantial evidence was received showing that the collision occurred when Groff's plane unexpectedly approached the burn site in the wrong direction and at the wrong altitude, but the court excluded the additional proffered evidence on the ground of relevancy. "[T]he court finds that the mental state of the pilots who were victims of the unfortunate events in this case are not relevant; that the issue of negligence of the pilots and whatever cause there may be for that negligence is, once again, not relevant nor admissible."

### a. Evidence of Groff's Blood-alcohol Level

Brady first contends that the trial court erred in excluding evidence that Groff's blood-alcohol level reflected in a postmortem toxicology report was .044 percent, slightly more than the .04 percent permitted by the FAA. Brady argues that this evidence would have relieved him of liability "(a) if flying under the influence was a concurrent cause of his death, and (b) if such intentional misconduct was not reasonably foreseeable." The initial problem with Brady's position is that his offer of proof did not extend as far as his argument. While the proffered evidence was that Groff's blood-alcohol level was .004 percent higher than permitted by the FAA, there was no offer to prove that the alcohol had an appreciable effect on Groff's flying abilities or was a substantial factor in causing the collision. Indeed, the evidence was that Groff was in the air for several hours, making six prior drops of fire retardant with no signs of aberrant behavior, before the fatal collision.

 "It is the burden of the proponent of evidence to establish its relevance through an offer of proof or otherwise," and a specific offer of proof is necessary in order to preserve an evidentiary ruling for appeal. (*Schmies, supra,* 44 Cal.App.4th at pp. 51, 53.) "An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued." (*Id.* at p. 53.) In support of a pretrial motion to dismiss, Mortensen's attorney submitted a letter from a Dr. Donald R. Rogers, who opined that "At a blood alcohol level of 50 milligrams percent, judgment is often impaired, but no one appears intoxicated to a casual observer. This impairment *could* explain the apparent mistake made by Mr. Groff to cause

the collision." (Italics added.) Brady relied on this letter in urging admission of the evidence of Groff's blood-alcohol level. In a subsequent motion for reconsideration of the ruling excluding the evidence, he reiterated that Rogers will "opine that Groff's alcohol consumption could have caused Groff's erratic flying during his last flight."[9] No offer was made to have Dr. Rogers or anyone else opine that Groff's judgment was impaired by alcohol consumption. (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 772–778, especially pp. 775–776 [107 Cal.Rptr.2d 617, 23 P.3d 1143] [" 'mere possibility of . . . causation is not enough,' " citing Prosser & Keeton, Torts (5th ed. 1984) § 41, p. 269]; *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107 [29 Cal.Rptr.3d 127]); *People v. Armitage* (1987) 194 Cal.App.3d 405, 419, fn. 9 [239 Cal.Rptr. 515] [speculation that victim would not have drowned if flotation device had been available is insufficient to support inference that lack of flotation device proximately caused death].)

In any event, Brady's attempt to define Groff's "intentional misconduct of flying under the influence of alcohol" as a superseding cause of the pilots' deaths is unavailing. The issue of proximate causation is increasingly being viewed in terms of the scope of the risk created by the wrongdoer's conduct. (See, e.g., 1 Dobbs, The Law of Torts (2001) §§ 186–187, pp. 460–464; Rest.3d, Torts (Proposed Final Draft No. 1) §§ 29, 33, 34.) "[C]ourts usually reduce the tests of proximate cause, both in direct and in intervening cause cases, to a question of foreseeability. To some extent, the language of foreseeability is a short hand expression intended to say that the scope of the defendant's liability is determined by the scope of the risk he negligently created." (1 Dobbs, The Law of Torts, *supra*, § 187, p. 463.) "Recognizing that the underlying issue is scope of the risk and that a separate superseding cause analysis pursues a foreseeability determination already made in assessing the scope of the risk the defendant negligently created, courts have concluded that instructions about superseding cause are both duplicative and confusing. [Fn. omitted.] Consequently, the issue in intervening cause cases, like the issue in others, is whether the general type of harm inflicted was foreseeable and thus within the risk of harm created by the defendant's negligent conduct." (*Id.* (2004 supp.) § 197A, pp. 92–93.) According to the draft of the Restatement Third of Torts, section 34 (Proposed Final Draft No. 1), "When a force of nature or an independent act is also a factual cause of physical harm, an actor's liability is limited to those harms that result from

---

[9] The motion for reconsideration contained a section labeled "Offer of Proof," the relevant paragraph of which read in full as follows: "Dr. Rogers will testify that pilot Groff's blood alcohol level at time of collision was .04 in violation of federal aviation regulations. He will opine that the ethanol in Groff's tissues was not likely produced by bacteria during the natural decomposition process. He will further opine that Groff's alcohol consumption could have caused Groff's erratic flying during his last flight."

the risks that made the actor's conduct tortious."[10] Expressed in this manner, it becomes clear that so long as the midair collision of aircraft engaged in fighting the fire was among the risks foreseeably created by recklessly starting the fire, Brady is responsible for the collision and its consequences. This assessment is in full accord with the principles long articulated by California courts. " '[I]t is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' " (*Schmies, supra,* 44 Cal.App.4th at p. 50; see also *People v. Crew, supra,* 31 Cal.4th at p. 847 [a "defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act"].)

Even if Brady had proffered sufficient evidence to support a finding that Groff's alcohol consumption was a substantial factor in causing the midair collision, this finding would not have affected the collision's foreseeability to Brady, and thus would not have absolved him of responsibility for the deaths.[11] The relevant question is whether, when recklessly starting the forest fire, Brady could reasonably anticipate that aircraft would be summoned to extinguish the fire and that a fatal collision might result. The question is not whether Brady could reasonably anticipate other causes that might also contribute to the collision. Accordingly, the evidence of Groff's alcohol consumption was properly excluded.

Moreover, even if the evidence of Groff's blood-alcohol level had been admitted, the outcome would necessarily have been the same. The jury heard

---

[10] This articulation reflects a change from the view adopted by the Restatement Second, under which an intentional or criminal intervening act can more readily be determined to be a superseding cause eliminating the initial wrongdoer's liability. (Rest.2d Torts, §§ 442B, 449; see Rest.3d, Torts (Proposed Final Draft No. 1) § 34, com. a, pp. 674–675.) One of the factors that have prompted this revised approach in tort law has been the adoption of comparative liability principles. (Rest.3d, Torts (Proposed Final Draft No. 1) § 34, coms. a–e, pp. 667–675.) Since no such principles apply to criminal liability, there may be greater justification for retaining the former approach in criminal cases. Nonetheless, under neither approach is a defendant relieved of liability by an intervening criminal act that is within the scope of the risk created by defendant's conduct. Moreover, both the Restatement Second and the current draft of the Restatement Third recognize that one who "recklessly causes physical harm is subject to liability for a broader range of harms than the harms for which that actor would be liable if only acting negligently." (Rest.3d, Torts (Proposed Final Draft No. 1) § 33(b); see Rest.2d Torts, § 501(2) & § 435B, com. a, pp. 455–456.)

[11] In more extreme circumstances, a different conclusion might be appropriate. Thus, if the proffered evidence were that the pilot intentionally caused the accident, or even that he was seriously inebriated, it might well be appropriate to permit the jury to consider whether those facts were so unforeseeable as to be beyond the risk created by setting the fire and creating the need for aircraft to respond. (Compare Rest.2d Torts, § 442B and com. c thereto with Rest.3d, Torts (Proposed Final Draft No. 1) § 34, coms. e & g, pp. 673–677.) However, Brady's offer of proof suggested no conduct by Groff approaching such an extreme.

all of the evidence that was presented describing the collision. It learned that the accident was not the more common collision of a single aircraft engaged in fighting a forest fire, but occurred when Groff's plane approached the fire zone from the wrong direction and at the wrong altitude, colliding with the second plane. Based on this evidence, the jury concluded that the pilots' deaths were reasonably foreseeable consequences of setting the fire which predictably brought the airborne firefighters to extinguish it. For the jury to have found Groff's flying with alcohol in his system to be a superseding cause, it would have been required to find not only that Groff's conduct was unforeseeable, but that the resulting fatal collision was also unforeseeable. Since the jury necessarily rejected the latter proposition when it found that the pilots' deaths were proximately caused by the fire, excluding the evidence did not prejudice Brady's defense.

### b. Evidence of Groff's Failure to Comply with CDF Aviation Regulations

The evidence that Groff failed to make radio contact prior to entering the fire area in violation of the CDF protocol also was properly excluded. Under the court's instructions, the jury could properly find it foreseeable that when multiple pilots are responding to a fire, two planes may collide due to pilot error or for any number of reasons. In *Schmies, supra,* 44 Cal.App.4th at page 55, the court held that the "illegal and dangerous act by defendant caused the officers to pursue him and ultimately caused the fatal accident. It adds not one whit to say that the officers violated the CHP pursuit guidelines." Likewise here, Brady's reckless conduct started the fire to which the firefighters responded. The jury found that the midair collision that ultimately caused the deaths of the pilots was a reasonably foreseeable consequence of setting the fire. The fact that the pilots were negligent in failing to make radio contact with the supervising pilot in violation of CDF protocol, if that is the case, does not relieve Brady of liability.

Brady cites *People v. Morse* (1992) 2 Cal.App.4th 620 [3 Cal.Rptr.2d 343], but that case supports exclusion of the proffered evidence. In *Morse,* the defendant was convicted of murdering two police officers who were killed while attempting to dismantle a bomb that the defendant had made. On appeal the defendant contended that the trial court "wrongfully excluded evidence of victim negligence relevant to proximate cause." (*Id.* at p. 631.) The court first noted that defendant had failed to preserve the issue in the trial court, but proceeded to reiterate the well established rule " 'in criminal prosecutions that the contributory negligence of the victim is not a defense. [Citations.] In order to exonerate a defendant the victim's conduct must not only be a cause of his injury, it must be a superseding cause. "A defendant may be criminally liable for a result directly caused by his act even if there is

another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." [Citations.] Thus, it is only an unforeseeable intervening cause, *an extraordinary and abnormal occurrence,* which rises to the level of an exonerating, superseding cause.' " (*Id.* at p. 639.) Brady made no proffer showing that there is anything extraordinary, abnormal, or unforeseeable about Groff's failure to comply with aviation regulations. Even if there were, the resulting collision remains what the jury found to be a foreseeable consequence of having started the forest fire.

### c. *Evidence of Groff's Physical Incapacitation*

Brady's proffered evidence of Groff's physical and mental incapacity resulting from a combination of heat, dehydration and loss of orientation was also properly excluded. So long as the jury found the collision to be a reasonably foreseeable consequence of the fire, the fact that the immediate cause of the accident was a pilot's dehydration and disorientation would have no effect on Brady's liability. Indeed, that is probably the chain of causation that a jury would consider most likely. A reasonable jury could not have concluded that it was "extraordinary and abnormal" that a pilot repeatedly flying over a forest fire and dropping fire retardant from 200 feet above the fire might become overheated or disoriented.

Contrary to Brady's argument, this "natural cause" of the collision is not entitled to special consideration as a superseding cause. In *People v. Hebert, supra,* 228 Cal.App.2d at pages 519–520, the court held that confusing instructions on proximate cause precluded the jury from evaluating the foreseeability of an intervening cause. Although the defendant had punched the drunken victim, the victim's subsequent fall while in police custody could have been found to be a superseding cause. "The jury could well have believed that except for that fall death would not have occurred. Of course, the question was not whether that particular event might occur, but whether any serious injury was likely to occur because of [the victim]'s condition. Defendant had a duty to anticipate the common and ordinary consequences of his act, and these he was responsible for. They could be said to be the direct consequences. But the fall in the police station could have been found to be an extraordinary and abnormal occurrence, not reasonably foreseeable as a result of the first injuries." (*Id.* at p. 521.) *Hebert* thus does not establish a separate rule for "natural causes" but reflects application of the well-

established rules of foreseeability.[12] In the present case, as we have previously stated, the jury was properly instructed that it could find Brady guilty only if it found that the deaths of the two pilots were foreseeable consequences of starting the fire. Brady does not challenge the sufficiency of the evidence to support that finding, and evidence that Groff had become dehydrated and disoriented could not have affected that finding.

### d. *Evidence that Groff's Plane was Negligently Maintained*

■ Brady argues that evidence of negligent maintenance of Groff's plane was excluded erroneously because another person's "[o]rdinary negligence may be a supervening cause, if that negligent act is not a response to the defendant's original wrongful act, and if that ordinary negligence is not foreseeable." As we have stated previously, there is no relevance to whether the maintenance of the aircraft was negligent, except as it may bear on the issue of foreseeability. (E.g., *Schmies, supra,* 44 Cal.App.4th at pp. 51–52.) However, it is unnecessary to consider whether evidence of poor maintenance might reach this threshold because defendant's proffered evidence simply was not sufficient to show that the accident was caused by a mechanical malfunction. Brady offered as evidence of negligent maintenance the testimony of Groff's widow that the engine on Groff's plane had failed one week prior to the accident, and that another pilot had complained that the cockpit of a similar plane had been leaking carbon monoxide exhaust a month prior to the accident. There is, however, no evidence that engine failure caused the accident, and the evidence that the crash may have been caused by carbon monoxide poisoning is highly speculative.[13] "The trial court is vested with wide discretion in determining the relevance of evidence. [Citation.] The court, however, has no discretion to admit irrelevant evidence. [Citation.] 'Speculative inferences that are derived from evidence cannot be deemed to

---

[12] Brady's attempt to analogize this case to the scarlet fever example set forth in Professor Focht's article, *Proximate Cause in the Law of Homicide—with Special Reference to California Cases* (1938) 12 So.Cal. L.Rev. 19, 31 is likewise unavailing. Focht describes a case in which the defendant wounded the deceased, who died not from his wound but from scarlet fever contracted from the physician who treated the wound. As Brady acknowledges, "It was held that proximate causation was lacking, because the disease, while the de facto result of the wound, was unforeseeable." Thus, dying of scarlet fever was not the natural and probable consequence of the initial wound. While the cause of death was natural or without misconduct, the determining factor was not lack of culpability of the victim or other person, but the unforeseeability of the intervening cause of death.

[13] Brady relies on the testimony of Donald Lykins, an airplane accident reconstruction expert, who testified at the preliminary hearing that the crash was caused by pilot incapacitation. When called upon to explain "what types of incapacitation [he] considered," Lykins responded, "I considered stroke, heart attack, heat prostration, self medication, fainting." However, he focused primarily on incapacitation caused by dehydration. Nowhere in the testimony did he suggest that the accident was caused by mechanical failure or inhalation of carbon monoxide.

be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253].) Accordingly, the trial court did not abuse its discretion in excluding the evidence that was proffered to show that Groff's plane was not properly maintained.[14]

### 4. Preinstruction on Proximate Cause[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. The Unanimity Instruction.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Disposition

The judgments are affirmed.

Corrigan, Acting P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied July 5, 2005, and appellants' petition for review by the Supreme Court was denied September 7, 2005.

---

[14] We also reject Brady's argument that the combination of any two of the proposed intervening causes would have been unforeseeable.

[*] See footnote, *ante*, page 1314.