Filed 9/17/25

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONALD DEAN PIERCE, JR.,<br><br>    Defendant and Appellant. | F086411<br><br>(Super. Ct. No. BF179192A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. and IV. of the Discussion.

**INTRODUCTION**

Defendant Ronald Dean Pierce, Jr., was convicted of second degree murder (Pen. Code,[1] § 187, subd. (a); count 1), gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count 2), driving under the influence of alcohol causing bodily injury (Veh. Code, § 23153, subd. (a); count 4), and driving with a blood-alcohol content of 0.08 or more causing bodily injury (Veh. Code, § 23153, subd. (b); count 5).[2] As to counts 4 and 5, the jury found true that defendant personally inflicted great bodily injury upon John and Jane Doe (§ 12022.7, subd. (a)), had an excessive blood-alcohol concentration of 0.15 percent or more (Veh. Code, § 23578), and refused to submit to chemical testing of his blood or breath (Veh. Code, § 23612). In bifurcated proceedings, the court found true the aggravating circumstance that defendant's blood-alcohol limit was three times the legal limit. Defendant was sentenced to a term of 15 years to life, plus four years, four months.

On appeal, defendant contends: (1) there is insufficient evidence of implied malice to support his conviction for second degree murder; (2) the implied malice instruction was deficient because it failed to inform the jury that an act that is " 'dangerous to human life' " is one that involves " 'a high degree of probability that it will result in death' "; (3) the court erred in instructing the jury with a special instruction on causation in lieu of CALCRIM No. 620 and the paragraphs on causation in the pattern instructions on the charged and some lesser included offenses; and (4) the court erred in denying his motion for mistrial based on the prosecutor's closing argument appealing to the jury's sympathy for the victims.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant was tried together with codefendant Israel Maldonado. Maldonado was found not guilty on count 1, but guilty on count 3 of vehicular manslaughter (§ 192, subd. (c)(1)) and on counts 6 and 7 of reckless driving causing injury (Veh. Code, § 23105, subd. (a)). Maldonado is no longer a party to this appeal inasmuch as his appeal was dismissed for failure to file an opening brief.

In the published portion of the opinion, we reject defendant's challenge to the sufficiency of the evidence. Specifically, we hold substantial evidence supports a finding that defendant's act satisfied the objective element of implied malice because it involved a high degree of probability that the act would result in death. (*People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).) We also hold substantial evidence supports the jury's finding on the subjective element of implied malice, i.e., that defendant consciously disregarded the danger his actions posed to human life. Finally, we hold the instructions given on implied malice were legally correct.

In the unpublished portion of the opinion, we hold the instructions on causation were legally correct. We also hold the trial court did not abuse its discretion in denying defendant's motion for mistrial.

We therefore affirm.

## FACTUAL BACKGROUND

Defendant drove while intoxicated and at a high rate of speed along Old River Road in Bakersfield. He collided with the back of Maria N.'s minivan, causing her van to be pushed over a median into oncoming traffic, where it was struck by another vehicle. Maria was killed and her two nine-year-old grandchildren were seriously injured in the collision.

The collision was preceded by an apparent street race involving three vehicles: a red Mustang driven by defendant, a gray Dodge Ram truck driven by codefendant Maldonado, and a yellow Ferrari driven by Harjinder S.[3]

---

[3] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

## I. The Collision

The collision occurred on November 24, 2019,[4] on Old River Road between White Lane and Ming Avenue. The roadway is "heavily traveled," with three lanes in either direction going north and south, separated by a large center median. The speed limit on this section of Old River Road is 55 miles per hour.

Video footage from defendant's dashcam shows that he arrived at the parking lot of a restaurant on White Lane at 11:44 a.m. and left at 4:35 p.m. Approximately one minute after pulling away from the restaurant, he can be heard saying, "[Unintelligible] fucked up. Whatever."

At approximately 4:45 p.m., Alvaro V. approached the intersection of White Lane and Old River Road, traveling eastbound on White Lane in one of two left turn lanes turning northbound on Old River Road. He heard revving noises and squealing tires and observed a Mustang and Dodge Ram stopped at the intersection, in the northbound lanes of Old River Road, with the Mustang to the right of the Ram. Video footage from another vehicle showed the tires of the Ram spinning, squealing, and smoking. Alvaro saw the driver of the Mustang speak excitedly to the driver of the Ram.

Linda P. was in the passenger seat of the Dodge Ram being driven by Maldonado. Linda testified that the Ram was stopped in the northbound middle lane at the intersection of White Lane and Old River Road when the Mustang pulled up on the passenger side. The driver of the Mustang rolled down his window, laughed, and said, "I don't know how to do it," apparently referring to Maldonado spinning the tires of the Ram. Linda said something to the effect of, "You've got to keep your foot on the brake." She believed she received that information from Maldonado.

---

[4] Unless otherwise stated, all events described herein occurred on November 24, 2019.

4.

Alvaro saw a Ferrari approach the intersection and accelerate as the light turned green. The Ram and the Mustang also accelerated rapidly into the intersection. Linda was not sure whether the vehicles were racing because they never expressly agreed to race.

Meanwhile, Eric M. was driving northbound in the rightmost lane on Old River Road when he saw a saw a red "muscle car" coming up behind him "extremely fast." A black truck was keeping pace with it, and Eric estimated they were traveling approximately 90 miles per hour. Another witness believed the vehicles were racing and estimated their speed to be around 100 miles per hour. However, Eric had just turned onto Old River Road and was traveling between 15 and 25 miles per hour, so he "floored the g[]as[] pedal" to avoid or minimize an anticipated collision. "[A]t the very last second," the red vehicle swerved around Eric's vehicle. Eric saw the red car and the truck continue racing.

Around this time, Linda became afraid and told Maldonado to "[c]hill out" or slow down. At some point, Linda lost sight of the Ferrari after it turned on its signal light and appeared to initiate a turn in a different direction from the Ram. Another witness also noted that the yellow vehicle obviously slowed down.[5]

When the vehicles were approximately 1,000 feet ahead of Eric, he saw the red car swerving or "fishtailing." Eric did not recall seeing any kind of contact between the truck and the red car and did not see the truck swerving. He acknowledged that he told law enforcement, "I don't know if he bumped the black truck or if he flew into the white vehicle in front of him." Eric's passenger Jamey M. told law enforcement that she believed the Ram clipped the back of the Mustang, but she admitted at trial that this was an assumption based on seeing the Mustang "fishtail" before it lost control. She did not

---

[5] The Ferrari drove past the accident scene traveling northbound approximately one minute after the collision.

5.

see the Ram make contact with the Mustang. Linda also did not see or feel the Ram hit the Mustang.

Eric then saw the Mustang and the vehicle in front of it "sp[i]n out and fl[i]ng off towards the left." Dashcam video from defendant's vehicle shows him veering from the right lane into the middle lane, where he collided with the rear of Maria's van at 4:45 p.m.

At the same time, James S. was driving southbound on Old River Road in his GMC 7500 service truck. He heard a loud engine roar and looked to the left, where he saw a red car coming up very fast behind a minivan. Another witness in a vehicle adjacent to James similarly heard an engine revving and tires screeching. James saw the red car appear to hit the rear passenger corner of the minivan. The van was pushed over the median and into oncoming traffic on southbound Old River Road, where it was struck by James's truck.

After the collision, the Ram pulled over and turned on its hazard lights. Maldonado called 911 and reported there was an accident, a "[g]entleman was speeding and uh . . . looks like he uh . . . ran the median." He denied being involved and denied that anyone was injured. Maldonado got out of the Ram and went toward the minivan. Linda got out of the Ram and went to the Mustang. The driver of the Mustang, who Linda identified as defendant, said he was fine and told her to go check on the other people.

James got a hammer out of his truck to break the windows of the van to see if there was anyone he and his passenger could help. He saw three people stuck inside the vehicle and was unable to help them. A girl in the front seat was pinned against the dash. A boy in the back was smashed against the rear bench seat and the wall of the van. A dead woman was in the driver's seat.

Eric eventually reached the collision site and pulled over behind the Ram. Jamey called 911.

6.

Linda eventually went toward the minivan but there were already other people gathered there who told her not to look. Maldonado told Linda they had to leave but Linda said they should wait to make sure everyone was okay. However, Maldonado again said they had to go and so Linda left with him.[6] Jamey saw the driver of the Ram walking toward his vehicle and took a photograph of the Ram's rear license plate in case the vehicle left the scene.

Maria died of multiple blunt force trauma. The parties stipulated that her nine-year-old grandchildren suffered great bodily injury as defined under section 12022.7, subdivision (a), and that they sustained one or more of the injuries listed in Vehicle Code section 23105, subdivision (b).

## II. The Investigation

### A. Contact with Defendant

When Bakersfield Police officers arrived on scene, the Mustang was at rest against a tree in the center median, the minivan was at rest against a commercial truck in the southbound lanes of Old River Road with the occupants still inside, and there was a field of debris.

Bakersfield Police Detective M. Lugo approached defendant, who was sitting in the front passenger seat of his Mustang. There was damage to the front of the Mustang and the airbag had been deployed. Defendant declined medical aid. He admitted that he had been in an accident but stated he did not remember anything else.

Lugo asked defendant for his driver's license. After mistakenly giving Lugo his credit or debit card, defendant struggled to get his driver's license out of his wallet. Lugo noticed that defendant had red, bloodshot eyes, slurred speech, and smelled of alcohol. Defendant stepped out of the Mustang per Lugo's orders; he had an unsteady gait and a

---

[6] Linda and Maldonado left the scene about five minutes after the accident and went to dinner. They later went to a store where Linda "goof[ed] around" by riding in the shopping cart and bought Christmas gifts and other items.

"natural sway" when he was standing still. Detective Lugo asked defendant some preliminary questions and defendant repeatedly refused to answer.

Lugo administered a horizontal gaze nystagmus test to determine whether defendant was intoxicated. Defendant showed "obvious signs of alcohol intoxication" with this test. Lugo then turned further investigation over to Bakersfield Police Officer J. Moreno.

Moreno approached defendant and Lugo at the Mustang. Moreno asked defendant if he had been drinking and defendant reported that he had "a beer." Defendant initially said he would cooperate with the investigation of the collision but "became uncooperative and asked for a lawyer." Moreno observed that defendant smelled of alcohol, spoke with slurred speech, had red, watery eyes, and had a staggered gait. Defendant had abrasions on his left collarbone, suggesting that he had been injured by the seatbelt on the driver's side.

Moreno obtained a search warrant to get a sample of defendant's blood and transported defendant to a hospital for the blood draw. Once there, defendant refused to cooperate. Moreno and Lugo then leaned defendant forward so that his torso rested on a padded mattress to allow the nurse to draw blood. Defendant did not physically resist. A blood draw performed at 6:55 p.m. revealed that defendant's blood-alcohol concentration was 0.24 percent.

Maldonado was arrested at approximately 8:00 p.m. at his home. A breath sample voluntarily provided by Maldonado at approximately 10:44 p.m. detected no alcohol.

B.     **Vehicle Data**

Using BERLA hardware and software, law enforcement retrieved data from the "infotainment" center of the Mustang regarding its activities on November 24, 2019. This information included, in one second intervals, the bearing of the vehicle, its GPS location, the distance traveled from the previous entry, and its calculated speed based on location information. The BERLA information revealed that, at 4:42:15 p.m., the

8.

Mustang was in the northbound number 2 lane of Old River Road, slightly north of Campus Park Drive, and had a calculated speed of approximately 88 miles per hour. At 4:43:39 p.m., the Mustang was in the northbound number 3 lane of Old River Road, immediately south of the intersection with White Lane, and was traveling approximately 1.1 miles per hour. At 4:44:16 p.m., the Mustang was traveling approximately 130.6 miles per hour and was estimated to be in between the number 2 and number 3 northbound lanes of Old River Road, just north of White Oak. Between 4:44:18 p.m. and 4:44:25 p.m., the Mustang's wheel spin decreased from 113.2 miles per hour to 1.4 miles per hour, indicating a hard breaking event. At 4:44:29 p.m., the Mustang was stopped in the center median between the northbound and southbound lanes of Old River Road, just south of Ming Avenue. Between 4:35:09 p.m. and 4:44:25 p.m., the data reflected numerous hard acceleration events and hard braking events.

Bakersfield Police Officer C. Ott[7] used a Bosch Crash Data Retrieval Tool (Bosch tool) to retrieve data from both the Mustang and Ram. The Bosch tool reads and saves the airbag control module data "bit by bit." The airbag control module constantly monitors changes in the vehicle's wheel speed and acceleration and may record data for approximately five seconds preceding the deployment of safety devices.

The first vehicle Ott extracted data from was Maldonado's Ram. Ott noted that the Ram had no damage and was in "excellent condition." The data he retrieved showed there were no events in which the vehicle was damaged or deployed a supplemental restraint device. The Ram was tested to determine the top speed it could run based on its factory configuration, and the result was 105 miles per hour.

Ott then extracted data from the Mustang. He did not observe any damage, paint transfer, or scuffing of paint on the left rear quarter panel of the Mustang. The data from the Mustang showed that, five seconds prior to the collision, there was a wheel speed of

---

[7] At the time of trial, Ott was a detective with the Bakersfield Police Department.

129.1 miles per hour. At the time of impact, the wheel speed was 102 miles per hour. Ott explained that the Mustang likely was traveling faster than 102 miles per hour at the time of impact because the antilock brake system had engaged and the wheels had locked up. However, he could not say for certain how much faster the Mustang was traveling.

The data Ott retrieved also showed that the gas pedal was fully depressed to the floor five seconds before the collision, and remained so two seconds before the collision. The brake pedal was depressed 1.5 seconds before impact.

The data revealed a minimal yaw rate in the five seconds before impact, indicating the Mustang was rotating to the right to an insignificant degree. One second before impact, the steering wheel was turned 11.2 degrees to the right. One tenth of a second later, it was turned 12.5 degrees to the right. One half-second before impact, it was turned 20.7 degrees to the right. One tenth of a second before impact, it was turned 58.8 degrees to the right. At impact, it was turned 61 degrees to the right. The data showed that the vehicle was traveling at a high speed while braking and turning right at the same time, causing it to exceed the coefficient of friction of the roadway and skid out of control.

None of the data or physical evidence indicated that the Mustang had been bumped by another vehicle before the collision. Ott acknowledged that video footage showed the Mustang "take a dip" after it passed the Ram. Ott described the dip as "significant," and something one would need to be cautious of if traveling at high speed. He did not measure or otherwise calculate the slope of the dip but noted a "slight crown" in the roadway.

Based on dashcam footage and his investigation of the scene, Ott calculated that the Mustang was traveling 127 miles per hour five seconds before impact and 97 miles per hour at the time of impact.

## III.    Defendant's Defense Case

Defendant presented evidence from accident reconstructionist C. Armstrong. Armstrong was tasked with analyzing whether it was possible the Ram could have impacted the Mustang and caused the Mustang to be redirected. He reviewed the Mustang's dashcam video, police reports from the collision, data from the event data recorder and retrieved through the BERLA system, calculations prepared by Ott, preliminary hearing and trial transcripts, and defense counsel's trial notes. Armstrong did not go to the scene or view or measure the curve in the road, but rather used Google Earth and Google Streetview to assess the roadway.

Armstrong was aware that Jamey reported to law enforcement that she saw the Ram move to the right and impact the Mustang. In his testimony, he referred to a video prepared by Ott that showed the dashcam video with text captions describing the vehicle speed, wheel speed, and the extent to which the accelerator was depressed. It appeared to Armstrong that the Ram was moving toward the Mustang on the right as the Mustang overtook it immediately before the collision. Armstrong opined that the right front bumper of the Ram "bumped" or "light[ly] tap[ped]" the left rear bumper of the Mustang while the Mustang was steering toward the right. It appeared to Armstrong that the force of the Ram striking the Mustang would be sufficient to overcome the friction forces restraining the Mustang.

Armstrong calculated the force of the Ram acting on the Mustang and then prepared a simulation of the vehicles traveling at speed, with the Ram bumping the Mustang at the calculated force. In the simulation, this bump caused the Mustang to lose stability and move to the left. Armstrong explained that the Mustang was being turned toward the right immediately prior to the collision, but not enough to avoid the collision.

Armstrong also created a simulation of the collision for what would have occurred had the Mustang not been "nicked" by the Ram. Armstrong explained that, without impact from the Ram, the steering of the Mustang would have sent it to the right, rather

11.

than traveling to the left. However, he could not predict how defendant might have steered the vehicle had there been no impact from the Ram.

Armstrong also noted that the video appeared to show the Mustang encountering a dip in the roadway, which caused the Mustang to move vertically. He agreed it was "possible" that the dip in the road "exacerbated" the Ram's rightward motion into the Mustang. However, he did not believe it was possible that the dip caused the Mustang to drift into the number 2 lane. Rather, he opined that the impact from the Ram caused the Mustang to move into the number 2 lane, where the Mustang collided with Maria's van: "[B]ut for being redirected by the impact with the Ram, [defendant] would have continued down the Number 3 lane, and, perhaps, passed the van."

When asked why the Mustang's stability control did not engage when the Mustang was traveling the opposite direction of its steering, Armstrong explained that this incident involved "relatively small movements and steering inputs" that would not activate the stability control. Armstrong disagreed with Ott's assessment that the Mustang was out of control prior to the collision, inasmuch as the Mustang was responding to defendant's steering inputs.

Armstrong believed "a significant gap . . . between the plastic bumper cover and the quarter panel" on the left rear bumper of the Mustang could have been from impact with the Ram. However, he acknowledged that he could not say for certain that the Ram caused this damage, and he acknowledged that the Mustang "had quite a ride after the collision with the van." He did not see, and would not expect to see, any visible damage to the Ram to indicate it had nicked another car.

A private investigator testified that he spoke with Jamey twice by phone to have her confirm or deny her statement to police regarding any contact between the Ram and Mustang. On both occasions, Jamey confirmed that, on the date of the accident, she believed the Mustang must have been "nipped" by the Ram based on the Mustang "fishtail[ing]" after the two cars were very close to one another.

Defendant also presented character witnesses that testified defendant had good character and judgment.

## IV. Maldonado's Defense Case

Maldonado also presented testimony from an accident reconstructionist, Dr. J. Maatuk. Maatuk reviewed the videos, law enforcement data, and reports from the collision, as well as the preliminary hearing transcript. He opined that Ott's method of pacing a car to determine its speed, which was described at the preliminary hearing, was less accurate than using GPS, and he therefore opined that Ott's average speed calculations were unconvincing.[8] Maatuk's opinion based on the data and video was that the Ram was traveling 75 miles per hour immediately before the crash. The fastest that the Ram could possibly drive was 105 miles per hour.

Maatuk also opined that the Ram never made contact with the Mustang. Maatuk explained that the yaw angle sensor reflected that, in the seconds before impact, the Mustang had only minor variation in its yaw angle, whereas the yaw angle would have been bigger had the Mustang made contact with the Ram. He also would have expected to see yaw motion of the Mustang body on the dashcam video, which he did not. Maatuk also would expect to see some damage or paint transfer on the Ram if the vehicles made contact, and there was none. Lastly, he would expect some data in the vehicle's black box to show the Ram made contact with the Mustang, and there was none. Moreover, even if the Ram had bumped the Mustang, Maatuk opined that it would not be possible for that to cause the Mustang to veer to the left.

---

[8] Additionally, Maldonado presented testimony from a private investigator and former police officer who had paced cars on numerous occasions to determine their speed. He estimated that the minimum time required to get an accurate pacing of a car was 10 to 15 seconds. He had never calculated speed from a video.

Maatuk opined that the cause of the collision was the Mustang veering from the right lane to the middle lane at high speed.

Maldonado presented several character witnesses, all of whom testified that Maldonado had good character and judgment.

Maldonado also presented evidence that Harjinder S., the driver of the Ferrari, was contacted by phone, but was not arrested or cited in relation to the collision.

## V.  Rebuttal Case

Detective J. Diederich opined that the cause of the collision was the unsafe speeds of the Mustang and Ram.  He additionally opined that the Ram did not bump into the Mustang before the Mustang collided with the van.

## DISCUSSION

## I.  Substantial Evidence of Implied Malice

Defendant contends his conviction for second degree murder must be reversed because the prosecution failed to prove he acted with implied malice.  More specifically, defendant contends that the California Supreme Court redefined the objective component of implied malice murder in *Reyes*, *supra*, 14 Cal.5th at page 989, to require that the defendant's act must involve " ' " '*a high probability that it will result in death*.' " ' " Defendant contends the evidence failed to meet this standard and, additionally, failed to show he subjectively appreciated the risk involved in his act.  We conclude substantial evidence supports the conviction.

### A.  Standard of Review

"The test for evaluating a sufficiency of evidence claim is deferential."  (*People v. Flores* (2020) 9 Cal.5th 371, 411.)  In reviewing the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' "  (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)  "We

14.

must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919, superseded by statute on other grounds as stated in *People v. Hin* (2025) 17 Cal.5th 401, 441.) "We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Flores*, at p. 411.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

## B. Overview of *Watson* Murder

Murder is the unlawful killing of a human being with malice aforethought. (§§ 187, subd. (a), 188, subd. (a)(3).) Malice may be either express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) It has long been established that "[m]alice may be implied when a person willfully drives under the influence of alcohol." (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 681 (*Wolfe*).)

"Implied malice requires proof of both a physical act and a mental state." (*In re Ferrell* (2023) 14 Cal.5th 593, 600.) The physical act required to support a finding of implied malice must be dangerous to life (*ibid*.), a requirement we discuss in further detail below. "To establish the mental state required for implied malice, the defendant must deliberately perform the act with a conscious disregard for life, knowing the act endangers another's life." (*Ibid.*) The test therefore involves an objective component (an intentional act endangering the life of another), and a subjective component (knowledge and disregard of the danger). (*People v. Clements* (2022) 75 Cal.App.5th 276, 299.)

*People v. Watson* (1981) 30 Cal.3d 290 (*Watson*) is the leading case on vehicular murder involving implied malice. There, the defendant drove to a bar and consumed large quantities of beer. After leaving the bar, he drove through a red light and narrowly

avoided a collision with another car. He then drove away at high speed, accelerating to 84 miles per hour before suddenly braking and skidding into an intersection where he collided with another car, killing two people. The defendant's blood-alcohol level one-half hour after the collision was 0.23 percent. An information charged him with two counts of second degree murder, but the trial court granted the defendant's pretrial motion to dismiss the murder counts. (*Id.* at pp. 293–294.)

On the People's appeal, our Supreme Court reversed the dismissal, holding there was sufficient evidence to hold the defendant to answer for second degree murder. (*Watson*, *supra*, 30 Cal.3d at p. 301.) The court cited to the following evidence as sufficient to support a finding that the "defendant's conduct was sufficiently wanton to hold him on a second degree murder charge" (*id*. at p. 300): the defendant's blood-alcohol level was sufficient to find him legally intoxicated; he drove to the establishment where he was drinking knowing that he had to drive later; he could be presumed to be aware of the hazards of driving while intoxicated; he drove at high speeds on city streets, creating a great risk of harm or death; and he was aware of the risk, as shown by the near collision and his belated attempt to brake before the fatal collision. (*Id.* at pp. 300–301.)

Since *Watson*, appellate courts have upheld numerous murder convictions in cases involving a defendant driving under the influence of alcohol. (*Wolfe*, *supra*, 20 Cal.App.5th at p. 682 [collecting cases].) "Generally, these opinions 'have relied on some or all of the following factors' that were present in *Watson*: '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' " (*Id.* at pp. 682–683.) However, "courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach." (*People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 698.)

### C.  Substantial Evidence of the Objective Element of Implied Malice

Relying on *Reyes*, *supra*, 14 Cal.5th 981, and a statement authored by Justice Evans and concurring in the high court's denial of review in *People v. Doaifi* (June 25, 2024, G062098) (nonpub. opn.), review denied October 16, 2024, S286155 (conc. stmt. of Evans, J.) (*Doaifi*), defendant contends the evidence fails to establish the objective element of implied malice because it fails to establish his act involved a high probability of death.  We disagree that the evidence fails to establish the objective element of implied malice murder.

### i.  Applicable Law

Courts have long lamented that "[t]he statutory definition of implied malice . . . is far from clear in its meaning."  (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).)  In response to this concern, " '[t]wo lines of decisions developed, reflecting judicial attempts "to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply." ' "  (*Id.* at p. 152.)  The earlier line of cases originated in Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, 480 (*Thomas*), and is sometimes referred to as the *Thomas* test or *Thomas* formulation.  The later line of cases derives from the high court's opinion in *People v. Phillips* (1966) 64 Cal.2d 574, 587 (*Phillips*), overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, footnote 12, and is sometimes referred to as the *Phillips* test or *Phillips* formulation.  (See *Knoller*, at p. 152.)  The *Thomas* test provides that malice is implied when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death."  (*Thomas*, at p. 480 (conc. opn. of Traynor, J.).)  The *Phillips* test provides that malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' "  (*Phillips*, at p. 587.)

Thus, under the *Thomas* test, the objective act underlying implied malice is described as one which involves "a high degree of probability that it will result in death." (*Thomas*, *supra*, 41 Cal.2d at p. 480 (conc. opn. of Traynor, J.).) Meanwhile, the objective act underlying implied malice for the *Phillips* test is described as one with natural consequences "dangerous to life." (*Phillips*, *supra*, 64 Cal.2d at p. 587.) However, in subsequent cases, the high court "made it abundantly clear that the two definitions of implied malice" in the case law "articulated one and the same standard." (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1219; see *id*. at pp. 1221–1222; accord, *Knoller*, *supra*, 41 Cal.4th at p. 152 [reaffirming that, under the objective component of implied malice, " ' " 'dangerous to life' " ' " means the same thing as a " 'high degree of probability that' " the act in question " 'will result in death' "]; see also *Watson*, *supra*, 30 Cal.3d at p. 300 [explaining that the two formulations embody the same standard "[p]hrased in a different way"].) In line with these holdings, the high court also held that implied malice instructions need not inform the jury that the physical act must involve " 'a high probability that [the act] will result in death,' " so long as the instruction informs the jury that the act "is one 'the natural consequences of which are dangerous to life,' " because the two phrases "are equivalent and are intended to embody the same standard." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111 (*Nieto Benitez*).)

Nonetheless, Justice Liu arguably suggested these two formulations differ in his concurring opinion in *Cravens*, *supra*, 53 Cal.4th 500. There, the Court of Appeal had reversed the defendant's conviction for insufficient evidence that his act – punching a fatigued, intoxicated, and smaller victim with significant force – involved a high degree of probability of death, i.e., the evidence was insufficient under the *Thomas* formulation. (*Id.* at pp. 507–509; see *id.* at p. 514 (conc. opn. of Liu, J.).) However, the high court concluded the totality of the circumstances supported a finding that the defendant's act was "predictably dangerous to human life," i.e., the evidence was sufficient under the *Phillips* formulation. (*Cravens*, at p. 510.)

In his concurring opinion, Justice Liu agreed that "the circumstances [fell] just within the outer bounds of conduct sufficiently dangerous to satisfy the *Phillips* test of ' "an act, the natural consequences of which are dangerous to life." ' " (*Cravens*, *supra*, 53 Cal.4th at p. 514 (conc. opn. of Liu, J.).) However, he criticized the majority for omitting all mention of the *Thomas* test. (*Id.* at p. 514 (conc. opn. of Liu, J.).) He read the majority's opinion as suggesting that "the *Phillips* formulation matters in a close case." (*Ibid.*) He noted that the high court had "never disavowed the *Thomas* formulation of implied malice, particularly with respect to the objective component." (*Id.* at p. 513 (conc. opn. of Liu, J.).) He explained, "If *Thomas*'s 'high degree of probability' test is to become disfavored in our doctrine, I prefer we consider and resolve the issue explicitly—if not in this case, then in a future case—instead of leaving it to mere implication. Since the issue is not specifically considered here, I express no view on *Thomas*'s continued validity." (*Id.* at p. 514 (conc. opn. of Liu, J.).)

Ultimately, Justice Liu explained that the *Thomas* test "recognizes that the ultimate inquiry involves a determination of probability: Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible. The *Thomas* test strikes that balance by requiring a 'high degree of probability' of death." (*Cravens*, *supra*, 53 Cal.4th at p. 513 (conc. opn. of Liu, J.).) He therefore concurred on the ground that "[t]he *Phillips* formulation still requires some probabilistic assessment of when an act becomes sufficiently 'dangerous' to life." (*Id.* at p. 514 (conc. opn. of Liu, J.).)

More recently, however, the high court reaffirmed the similarity of the two formulations while providing clarification on the governing standard in *Reyes*, *supra*, 14 Cal.5th 981. *Reyes* involved the high court's review of a petition for resentencing brought pursuant to section 1172.6. The defendant was one of several gang members or affiliates present when a killing occurred but was not the shooter. He had been prosecuted under a theory that he was guilty of murder as an aider and abettor to either

19.

assault or disturbing the peace, and that murder was a natural and probable consequence of those offenses. (*Reyes*, *supra*, 14 Cal.5th at p. 984.) On the petition, the trial court determined the defendant had committed an act dangerous to human life sufficient to support a finding of implied malice, inasmuch as the defendant "travel[ed] 'along with several other gang members, one of which [was] armed, . . . to rival gang territory.' " (*Id.* at p. 987.)

Writing for a unanimous court in *Reyes*, Justice Liu returned to the *Thomas* test. Incorporating principles from Justice Liu's concurrence in *Cravens*, the high court held that the defendant's act could not support a finding of implied malice: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989, see *Cravens*, *supra*, 53 Cal.4th at p. 513 (conc. opn. of Liu, J.) ["the probability of death from the act must be more than remote or merely possible"].) However, the high court also once again cited with approval to case law explaining that an act with natural consequences " ' " 'dangerous to life' " ' " is the same as an act with a " ' "high degree of probability" ' " to result in death. (*Reyes*, at p. 989.) Accordingly, *Reyes* seemingly clarified that, while these formulations mean the same thing, implied malice under either formulation requires an act that is not merely dangerous to life in some vague, speculative, or remote sense, but one that has a high degree of probability of resulting in death.

More recently, in a statement concurring in the high court's denial of review in *Doaifi*, *supra*, G062098 (conc. stmt. of Evans, J.), Justice Evans, joined by Justice Liu, asserted based on *Reyes* that the *Thomas* test is controlling and implied malice requires " 'a high degree of probability that [the act] will result in death.' " In *Doaifi*, the defendant was convicted of second degree murder "after a tragic accident" that involved him driving at an excessive speed and ultimately colliding with another driver who was making a turn from the opposite direction. (*Ibid.*) The defendant was not impaired,

20.

swerving, weaving through traffic, or running stop signs or traffic lights. (*Ibid*.) Because the Court of Appeal had not analyzed the objective component of implied malice murder liability or determined whether the defendant's conduct " ' " 'involve[d] a high degree of probability that it [would] result in death,' " ' " Justice Evans wrote separately to "urge the lower courts to specifically analyze this factor when assessing implied malice in these circumstances." (*Ibid*.)

Justice Evans acknowledged the line of cases equating the *Thomas* and *Phillips* tests but relied on Justice Liu's concurrence to *Cravens* to assert that the different phrasing " 'matters in a close case.' " (*Doaifi*, *supra*, G062098 (conc. stmt. of Evans, J.).) She found support for this position in *Reyes*, as well as in recent modifications to CALCRIM No. 520, which now requires that implied malice be based on an act, "the natural and probable consequences of [which] involved a high degree of probability that it would result in death." (*Ibid*., fn. omitted.) Justice Evans went on to opine:

> "As a class[,] *Watson* murders are unique. Not only do the defendants in such cases lack an intent to kill, but they can often claim an opposing intent: an affirmative desire not to harm anyone. Unsurprisingly, it is not uncommon for *Watson* murder defendants, as in this case, to have no prior criminal history of violence. Absent an intent to harm anyone, *Watson* murder cases turn on the defendant's subjective awareness of the objective risks that their grossly reckless behavior poses. However, in some cases, it may be difficult to characterize a *Watson* murder defendant's conduct as demonstrating a 'high probability that it will result in death.' [Citation.] For instance, as Chief Justice Bird noted in her *Watson* dissent, the mere fact of driving while intoxicated is not alone an act with a high probability that it will result in death: '[d]eath or injury is not the probable result of driving while under the influence of alcohol. Thousands, perhaps hundreds of thousands, of Californians each week reach home without accident despite their driving intoxicated.' [Citation.] The same can be said of speeding.
>
> "Because the underlying violations of the Vehicle Code that underpin most *Watson* murder cases are unfortunately commonplace, *Watson* murder cases often present the sort of 'close case[s]' [citation] in which the choice of phrasing of the implied malice standard (now resolved

by *Reyes* in favor of the ' " 'high degree of probability that it will result in death' " ' [citation]) may make a significant difference. In other words, as a general matter, it is relatively easy to surmise that a defendant's act is dangerous to life 'in some vague or speculative sense.' [Citation.] But to differentiate between gross vehicular manslaughter and second degree murder, more is required.

"It is for this reason that *Reyes*'s refinement of the objective component of implied malice is important in *Watson* murder cases. To be sure, in vehicular homicide cases, murder liability may be the appropriate sentence. And this is true even assuming a defendant's credible desire not to harm anyone. Such defendants can be said (subjectively) to exhibit . . . 'a base, anti-social motive and [] wanton disregard for human life' [citation] precisely because they are knowingly engaged in an activity that is (objectively) *highly likely to cause death*." (*Doaifi*, *supra*, G062098 (conc. stmt. of Evans, J.), fns. omitted, some italics omitted.)

Finally, Justice Evans opined that assessment of the risks of conduct such as speeding "must account for a myriad of factors" (*Doaifi*, *supra*, G062098 (conc. stmt. of Evans, J.)) and may, in some cases, require expert testimony on traffic fatalities to objectively establish a high degree of probability of death (*ibid*.).

### ii. Analysis

We conclude substantial evidence supports a finding that defendant's act satisfied the objective element of implied malice as clarified in *Reyes* because it was dangerous to life in more than a vague or speculative sense and instead involved a high degree of probability that the act would result in death. (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

Defendant drove with a highly elevated blood-alcohol concentration of 0.24 percent and at speeds of up to 129 miles per hour while on city streets having a 55-miles-per-hour speed limit and with many other drivers on the road. A rational juror could conclude that these factors combined raised the risk of death from the merely remote or possible to the highly probable. Indeed, these factors are substantially similar to those determined to be sufficient to support a finding of implied malice in *Watson*, where the defendant drove with a blood-alcohol concentration of 0.23 percent at speeds of up to 84

22.

miles per hour on city streets with a 35-miles-per-hour speed limit with several other vehicles on the road.  (*Watson*, *supra*, 30 Cal.3d at pp. 293–294.)

Nonetheless, relying on Justice Evans's statement concurring in the high court's denial of review in *Doaifi*, defendant contends substantial evidence does not support a finding of implied malice because the prosecution failed to present expert testimony that "[defendant's] act of driving while intoxicated at more than twice the speed limit on Old River Road while 'racing' Maldonado, or on any similar highway under similar conditions, constitutes an act involving a *high probability* that it would result in *death*." He points out that "[t]he prosecution did not present any statistics with regard to traffic fatalities resulting from collisions involving excessive speed and/or drunk driving or street racing in Bakersfield, in California, or anywhere else."

As defendant recognizes, Justice Evans's statement concurring in the high court's denial of review in *Doaifi* is not binding on us.  Defendant does not cite, and we do not find, controlling precedent suggesting that expert testimony is required to establish a high probability that a defendant's act will result in death.  In any event, Justice Evans does not suggest that expert testimony is required in all cases.  *Doaifi* involved a defendant speeding, but without other indicia of dangerous driving.  Under those circumstances, Justice Evans stated that use of an expert "may be needed" to establish whether a " 'high degree of probability' " of causing death exists in some cases.  (*Doaifi*, *supra*, G062098 (conc. stmt. of Evans, J.).)  However, she further acknowledged that "an objective analysis of the risk of speeding must account for a myriad of factors," including the type of roadway, the extent to which the speed exceeded the applicable speed limit, "time of day, visibility, traffic volume, weather, and road conditions." (*Ibid*.)  Ultimately, Justice Evans's statement acknowledges that the determination of dangerousness depends on the totality of the circumstances surrounding the defendant's driving.

However, defendant also disagrees that the circumstances surrounding his driving support a finding that his driving carried a high probability of death.  He contends that the

dashcam video of him leaving the restaurant parking lot shows him "generally following traffic laws other than speeding, and he made complete stops at all stop signs." He points out that the video evidence reflects "the roads were dry, there was sufficient lighting, good visibility, and traffic was light to moderate." He further contends he "appeared to be in complete control of his vehicle until about five seconds before the collision, even when driving at very high speeds," and asserts he was not driving erratically. He points to his ability to avoid colliding with Eric's vehicle as evidence of his control. He contends his inability to control the vehicle at the time of the collision may have been affected by a dip or crown in the roadway and/or being struck by the Ram. As such, he contends the evidence shows that any risk of death from his conduct was speculative, rather than highly probable.

On appeal, we are required to review the evidence in the light most favorable to the judgment (*Cravens*, *supra*, 53 Cal.4th at p. 507), and we do not resolve evidentiary conflicts (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162). We may not reverse the judgment simply because some circumstances might reasonably be reconciled with a contrary finding. (*Ibid.*) We therefore are not required to address defendant's contentions, which arise from conflicts in the evidence or alternative theories regarding the inferences to be drawn therefrom. (*Ibid.*) We nonetheless note that the dashcam video suggests defendant immediately had difficulty controlling his vehicle after encountering the Ram. When he accelerated from a stop into a curve, the Mustang veered out of its lane, into a bike lane, and toward the curb before correcting once the vehicle reached a straightaway. Additionally, although defendant was able to slow down and change lanes to avoid a collision or near-miss with Eric's vehicle, defendant's speed and approach was such that Eric anticipated a collision. Furthermore, evidence regarding whether the Ram clipped the Mustang was contested. Finally, defendant's own expert opined that the dip or crown in the road would not have caused the Mustang to drift into the lane where Maria's van was located. Defendant's contentions regarding contrary

24.

inferences to be drawn from the evidence do not convince us that the conviction is unsupported by substantial evidence.

Finally, we note that defendant contends the high court in *Reyes* "changed its position" on the objective component of implied malice and "redefin[ed] 'dangerous to human life' " to require a high probability that the defendant's act would result in death. Contrary to defendant's argument, the requirement that an act carry a "high probability" of death is not new, and *Reyes* itself noted the equivalence of the *Thomas* and *Phillips* formulations (*Reyes*, *supra*, 14 Cal.5th at p. 989).

In sum, substantial evidence supports a finding that defendant's act carried a high probability that it would result in death. The objective component of implied malice murder was satisfied.

### D.     Subjective Element of Implied Malice Murder

Defendant also contends substantial evidence does not support a finding that he acted with conscious disregard for the danger his actions posed to human life. We again disagree.

As indicated above, the subjective element of implied malice murder requires that the defendant actually appreciate the risk to life involved. (*Watson*, *supra*, 30 Cal.3d at pp. 296–297.) Again, courts generally refer to the following factors to guide this inquiry: " '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' " (*Wolfe*, *supra*, 20 Cal.App.5th at pp. 682–683.)

Three of these factors are overwhelmingly supported by the evidence in this case. First, defendant had a blood-alcohol concentration of 0.24 percent, well above the legal limit. Second, he exhibited highly dangerous driving, including traveling at speeds of up to 129 miles per hour, nearly 75 miles per hour over the speed limit. His driving included numerous hard acceleration and hard braking events, and he continued driving at high rates of speed, even after making a rapid lane change to avoid colliding with Eric's

25.

vehicle. Third, the evidence suggests defendant had a predrinking intent to drive, inasmuch as the dashcam video reflects that he drove himself to the restaurant parking lot. He left the parking lot several hours later and made no further stops before the collision, following which he was determined to have a highly elevated blood-alcohol concentration. (*Watson*, *supra*, 30 Cal.3d at p. 300 [predrinking intent to drive established where the defendant "had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later"].) The jury was entitled to infer from the totality of these circumstances surrounding defendant's driving that he was subjectively aware that his conduct endangered the lives of others on the roadway.

Nonetheless, defendant contends the evidence does not support a finding that he actually appreciated the risk of fatal harm arising from his act because (1) the evidence shows he braked and attempted to turn his vehicle to the right to avoid colliding with the van, and (2) no evidence was presented to show he had previous "alcohol related" violations that would have involved advisements of the dangers of driving under the influence. It is true that the record contains no evidence that defendant had prior convictions that would have advised him of the deadly consequences of intoxicated driving. While such evidence may be persuasive on the question of a defendant's subjective knowledge (see *People v. David* (1991) 230 Cal.App.3d 1109, 1115 ["Prior convictions and exposure to mandatory educational programs are admissible to show the accused's awareness of the life threatening risks of driving under the influence."]), this is only one of the factors that may be considered in determining whether a driver acted with implied malice (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988). The lack of such evidence does not defeat a determination that the remaining evidence is sufficient to support the conviction.

Furthermore, our Supreme Court has held that braking immediately prior to a collision may suggest actual awareness of the risk of harm created by a defendant's

dangerous driving. (*Watson, supra,* 30 Cal.3d at p. 301.) Here, defendant was fully depressing the accelerator mere seconds before the collision, then depressed the brake and tried turning the vehicle to the right. As in *Watson,* these attempted, and ultimately unsuccessful, evasive maneuvers were executed while defendant was driving at excessive speed while intoxicated, after having already once required evasive action to avoid a collision. These circumstances support the jury's finding that defendant was aware of the risk of fatal harm created by his driving and consciously disregarded the risk.

In sum, substantial evidence supports defendant's conviction for second degree murder.

## II. Implied Malice Murder Instruction

Defendant contends his conviction for second degree murder must be reversed because the jury was not instructed that " 'dangerous to human life' in the context of the objective component of implied malice murder" means "the act must be one that involves 'a high degree of probability that it will result in death.' " We conclude the instruction concerning implied malice murder was a correct statement of law and defendant therefore has not shown reversible error.[9]

### A. Additional Background

Defendant's jury was instructed with the then-current version of CALCRIM No. 520, modified as follows:

> "The defendants Pierce and Maldonado are charged in Count one with murder in violation of Penal Code section 187 (a). To prove that the defendant is guilty of this crime, the People must prove that:

---

[9] The People contend defendant forfeited this issue by failing to request clarifying instructions. "A failure to object, however, does not prevent a defendant from challenging an instruction on appeal if the asserted error affected the defendant's substantial rights." (*People v. Thomas* (2023) 14 Cal.5th 327, 382.) Inasmuch as defendant contends the court failed to instruct on an essential element of implied malice murder, we assume the claim was preserved.

27.

"1. The defendant committed an act that caused the death of another person  [¶]  AND

"2. When the defendant acted, he had a state of mind called malice aforethought  [¶]  AND

"3. He killed without lawful excuse.

"There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.

"The defendant had express malice if he unlawfully intended to kill.

"The defendant had implied malice if:

"1. He intentionally committed the act;

"2. *The natural and probable consequences of the act were dangerous to human life*;

"3. At the time he acted, he knew his act was dangerous to human life;  [¶]  AND

"4. He deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.

"If you find the defendant guilty of murder, it is murder of the second degree."[10]  (Italics omitted, italics added.)

**B.     Standard of Review**

We review a claim of instructional error de novo to ascertain whether the

instruction accurately states the applicable law.  (*People v. Ramirez* (2023) 98

---

[10] The quoted text is from the court's written instruction to the jury of modified CALCRIM No. 520, which is substantially the same as the reporter's transcript.  For readability, we have omitted the brackets, asterisks, and other words and punctuation clearly marked out in the written version.

Cal.App.5th 175, 218.)  In doing so, we consider the challenged instruction in the context of all the instructions given to the jury and the trial record.  (*People v. Rivera* (2019) 7 Cal.5th 306, 326; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816.)  " ' "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." ' "  (*People v. Thomas*, *supra*, 14 Cal.5th at p. 382.)  We presume that jurors are capable of understanding and correlating the court's instructions and we further presume those instructions were followed by the jury.  (*Ibid.*; *People v. Covarrubias* (2016) 1 Cal.5th 838, 915.)

A trial court has a sua sponte duty to instruct the jury on all elements of any charged offenses.  (*People v. Mil* (2012) 53 Cal.4th 400, 409.)  If a trial court incorrectly instructs on an element of a charged offense, the applicable standard of review for prejudice is the *Chapman* standard.  (*Neder v. United States* (1999) 527 U.S. 1, 9–10; accord, *People v. Mil*, at p. 409.)  Under the *Chapman* standard, reversal is required unless the People show the error was "harmless beyond a reasonable doubt."  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); see *People v. Flood*, *supra*, 18 Cal.4th at p. 475.)

### C.    Analysis

Defendant contends the high court's decision in *Reyes*, issued a few months after his trial, requires courts to instruct juries that implied malice murder requires an act that " ' "involve[s] a high degree of probability that it will result in death." ' "  (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

As we explained above, the high court in *Reyes* stated:  "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' "  (*Reyes*, *supra*, 14 Cal.5th at p. 989.)  However, as we likewise explained above, *Reyes* reaffirmed a long line of cases holding that the *Thomas* and *Phillips* tests

29.

articulate the same standard. (*Reyes*, at p. 989 [citing *Knoller*, *supra*, 41 Cal.4th at p. 152, for the proposition that, "under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death" ' "].)

Our Supreme Court also has addressed the applicable jury instructions for implied malice murder. In *People v. Dellinger* (1989) 49 Cal.3d 1212, 1221, the high court expressed concern that juries might misunderstand the *Thomas* formulation of the subjective component of implied malice, " 'wanton disregard for human life.' " It therefore opined that the "better practice in the future is to charge juries solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice," the *Phillips* formulation of the subjective element. (*Ibid.*) Following *Dellinger*, this language was incorporated into the standard jury instructions. (See CALJIC Nos. 8.11, 8.31; CALCRIM No. 520.)

Subsequently, in *Nieto Benitez*, the defendant challenged the accuracy of CALJIC No. 8.31 on grounds similar to those urged here. (*Nieto Benitez*, *supra*, 4 Cal.4th at pp. 110–111.) He argued CALJIC No. 8.31 "misstates the law because the instruction omits a requirement that defendant commit the act with a *high probability* that death will result," and instead instructed only that implied malice requires "an act whose 'natural consequences' are dangerous to life." (*Id.* at p. 111.) The high court disagreed and concluded the instruction "correctly distills the applicable case law." (*Ibid.*) The court noted, once again, that "the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Ibid.*)

We disagree with defendant's contention that CALCRIM No. 520, as given, was incorrect under *Reyes*. *Reyes* did not involve jury instructions or hold that trial courts must instruct that the act required to support a finding of implied malice must involve a

high probability that death will result.  Nor did *Reyes* purport to overrule or abrogate *Nieto Benitez*.  To the contrary, the court reaffirmed its long-standing precedent that the *Thomas* and *Phillips* tests articulate the same standard.  Because *Reyes* did not decide an instructional issue and did not overrule or disapprove of the high court's prior cases, we are bound by its decision in *Nieto Benitez*.  We therefore find no error in the implied malice instruction given at defendant's trial.

We recognize that, in March 2024, the Judicial Council modified CALCRIM No. 520 to require that the defendant "commit[] an act that caused the death of (another person . . .)" and "[t]he natural and probable consequences of the (act . . .) were dangerous to human life in that the (act . . .) involved a high degree of probability that it would result in death."  (CALCRIM No. 520; see Judicial Council of Cal., Crim. Jury Instns. (2024) Bench Notes to CALCRIM No. 520.)  For the reasons stated, we nonetheless conclude the instruction under the former version of CALCRIM No. 520 remains a correct statement of law, notwithstanding any clarification in *Reyes*.

Accordingly, defendant has not shown reversible error on this basis.

## III.  Instructional Error – Causation[*]

Defendant contends the judgment must be reversed because the court's instruction on causation, and the omission of standard paragraphs regarding causation in instructions given on the charged and lesser offenses, was erroneous, misleading, and confusing.  We conclude the instructions regarding causation were correct.

### A.  Additional Background

The prosecutor filed a brief regarding proximate causation, arguing that the existing CALCRIM jury instructions regarding proximate causation were irreconcilable with the law of intervening act causation.  The prosecutor suggested the court use the CALJIC instructions, supplementing them with special instructions regarding intervening

---

[*] See footnote, *ante*, page 1.

31.

act causation approved in other prior cases.  The prosecutor also provided the court with a draft instruction.

After the instructions were given, the court provided the parties an opportunity to make a record with regard to the instructions.  Counsel for Maldonado stated he wished to preserve an objection to the causation instructions, while acknowledging that the instructions had been approved in prior cases.  Counsel for defendant joined in the objection and requested the court give CALCRIM No. 620.[11]  The court noted the special instruction had been given over a defense objection.  The court also noted that it had, over defense objection, deleted paragraphs regarding causation from other pattern instructions to avoid conflicts within the special causation instructions.

The jury was instructed with Special Instruction No. 1 on causation as follows:

"The criminal law has its own particular way of defining cause.  A cause of death or injury is an act or acts that sets in motion a chain of events that produces as a direct, natural, and probable consequence of the act or acts the death or injury and without which the death or injury would not occur.

"For the purposes of determining causation, a direct, natural, and probable consequence is a consequence which is normal and is a reasonably foreseeable result of the original act.  The consequence need not have been a strong probability.  A possible consequence which might reasonably have

_____

[11] CALCRIM No. 620 provides, in relevant part:

"There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death.

"<A. Negligence of Decedent or Third Party, Not Medical Personnel>

"[The failure of _____ <insert name of decedent> or another person to use reasonable care may have contributed to the death.  But if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death even though _____ <insert name of decedent> or another person may have failed to use reasonable care.]"  (Italics omitted.)

32.

been contemplated is enough.  The precise consequence need not have been foreseen.  It is enough if the possibility of some harm of the kind which resulted from the act was foreseeable.

"There may be more than one cause of the death of Maria [N.] and/or the injuries to [her grandchildren].  When the conduct of two or more persons contributes concurrently as a cause of the death and/or injuries, the conduct of each is a cause of the death and/or injuries if that conduct is also a substantial factor contributing to the result.  A cause is concurrent if it is operative at the moment of the death and/or injuries and acted with another cause to produce the death and/or injuries.

"If you find that a defendant's conduct was a cause of death or injury to another person, then it is no defense that the conduct of some other person contributed to the death or injury.

"An intervening act may be so disconnected and unforeseeable as to be a superseding cause that, in such a case, the defendant's act will be regarded at law as not being a cause of the injuries sustained.

"It is not a defense to a criminal charge that some other person was guilty of negligence, which was a contributory cause of the death or injury involved in the case.

"If you have a reasonable doubt whether the defendant's act caused the death or injury, you must find him not guilty."  (Highlighting omitted.)

The first paragraph of the special instruction appears to be based on CALJIC No. 3.40.  The third and fourth paragraphs appear to be based on CALJIC No. 3.41.  The sixth paragraph appears to be based on CALJIC No. 8.56.  The seventh paragraph appears to be based on CALCRIM No. 620.  The remaining portions of the instruction appear to derive from *People v. Brady* (2005) 129 Cal.App.4th 1314, 1327 (*Brady*).

In addition to giving a special instruction, the court removed the causation paragraphs from the following instructions relating to defendant:  CALCRIM No. 520 (second degree murder with malice aforethought), CALCRIM No. 590 (gross vehicular manslaughter while intoxicated), CALCRIM No. 591 (vehicular manslaughter while intoxicated), CALCRIM No. 593 (misdemeanor vehicular manslaughter), CALCRIM No. 2100 (driving a vehicle under the influence causing injury), and CALCRIM No. 2101

33.

(driving with a 0.08 percent blood-alcohol concentration causing injury). The causation paragraphs omitted from CALCRIM No. 520 would have provided:

> "[(An act/ [or] (A/a) failure to act) causes death if the death is the direct, natural, and probable consequence of the (act/ [or] failure to act) and the death would not have happened without the (act/ [or] failure to act). A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.]

> "[There may be more than one cause of death. (An act/ [or] (A/a) failure to act) causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.]" (CALCRIM No. 520.) (Italics omitted.)

The causation paragraphs omitted from the remaining instructions were substantially similar.

## B. Applicable Law

Several of the charged and lesser included offenses required a jury finding that defendant's act proximately caused either bodily injury, great bodily injury, or death. (§§ 187, subd. (a), 191.5, subds. (a), (b), 192, subd. (c); Veh. Code, § 23153, subds. (a), (b).) "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' (See CALJIC No. 3.40.)" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*).) Our Supreme Court has "emphasized the primary significance of foreseeability to proximate cause." (*Brady*, *supra*, 129 Cal.App.4th at p. 1324, citing *People v. Roberts* (1992) 2 Cal.4th 271.)

" ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.) "Whether the defendant's

conduct was a proximate, rather than remote, cause of death is ordinarily a factual question for the jury unless ' "undisputed evidence . . . reveal[s] a cause so remote that . . . no rational trier of fact could find the needed nexus." ' " (*People v. Butler* (2010) 187 Cal.App.4th 998, 1010.)  "The criminal law thus is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." (*People v. Roberts*, *supra*, 2 Cal.4th at p. 319.)  "[T]here is no bright line demarcating a legally sufficient proximate cause from one that is too remote." (*Id.* at p. 320, fn. 11.)

In general, " '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' " (*Cervantes*, *supra*, 26 Cal.4th at p. 866.)  However, " ' "[t]here may be more than one proximate cause of the death.  When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result." ' " (*People v. Sanchez* (2001) 26 Cal.4th 834, 847, italics omitted.)  "If an intervening act, event or force is present, . . . it is necessary to determine whether that act, event or force is sufficient to absolve the defendant of liability 'because the "defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause." ' " (*Brady*, *supra*, 129 Cal.App.4th at p. 1325.)

" 'In law, the term "superseding cause" means "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible." ' [Citation.]  ' "In general, an 'independent' intervening cause will absolve a defendant of criminal liability.  [Citation.]  However, in order to be 'independent' the intervening cause must be 'unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.' [Citation.]  On the other hand, a 'dependent' intervening cause will not relieve the

35.

defendant of criminal liability. '. . . If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability.' " ' [Citations.] ' "[W]here [an] injury was brought about by a later cause of independent origin . . . [the question of proximate cause] revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable. If *either* of these questions is answered in the affirmative, then the defendant is not relieved from liability towards the plaintiff; if, however, it is determined that the intervening cause was not foreseeable *and* that the results which it caused were not foreseeable, then the intervening cause becomes a supervening cause and the defendant is relieved from liability for the plaintiff's injuries." ' [Citation.] Thus, '[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act.' " (*Brady*, *supra*, 129 Cal.App.4th at pp. 1325–1326.)

## C.     Jury Instructions on Intervening Cause

*Brady* involved special jury instructions addressing proximate cause in the context of an intervening or superseding cause. There, two defendants, Brady and Mortensen, "were accused of causing the deaths of two firefighter pilots who collided when responding to a fire that broke out near defendants' methamphetamine laboratory in a wooded area." (*Brady*, *supra*, 129 Cal.App.4th at p. 1318.) Brady was convicted of, among other things, "recklessly starting a fire that caused the deaths of the pilots." (*Ibid.*) Brady argued the intervening acts of one of the pilots and others were superseding causes that absolved him of responsibility for the deaths. (*Id.* at p. 1323.)

On appeal, Brady challenged the proximate cause instructions given at his trial (*Brady*, *supra*, 129 Cal.App.4th at p. 1318), which were nearly identical to those given in

*People v. Schmies* (1996) 44 Cal.App.4th 38, 50–51, footnote 7, and which read as follows:

> "CALJIC No. 3.40, in part: 'The criminal law has its own particular way of defining cause. A cause of death or great bodily injury is an act or acts that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or acts the death or great bodily injury and without which the death or great bodily injury would not occur.'
>
> "Court's Instruction Number 2: 'A direct, natural and probable consequence is a consequence which is normal and is a reasonably foreseeable result of the original act. The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen. It is enough if the possibility of some harm of the kind which resulted from the act was foreseeable.'
>
> "CALJIC No. 3.41: 'There may be more than one cause of the deaths of [the pilots]. When the conduct of two or more persons contributes concurrently as a cause of the deaths, the conduct of each is a cause of the deaths if that conduct is also a substantial factor contributing to the result. A cause is concurrent if it is operative at the moment of the death and acted with another cause to produce the death. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person, even the deceased person, contributed to the death.'
>
> "Court's Instruction Number 5: 'An intervening act may be so disconnected and unforeseeable as to be a superseding cause that, in such a case, the defendant's act will be regarded at law as not being a cause of the injuries sustained.'
>
> "CALJIC No. 8.56: 'It is not a defense to a criminal charge that the deceased or some other person was guilty of negligence, which was a contributory cause of the death involved in the case.' " (*Brady*, *supra*, 129 Cal.App.4th at p. 1327.)

"Brady argue[d] that the statement in CALJIC No. 3.41, that 'it is no defense that the conduct of some other person, even the deceased person, contributed to the death,' and the whole of CALJIC No. 8.56, conflict[ed] with the court's instruction No. 5. The former instructions, he assert[ed], precluded the jury from finding that [the pilot's]

37.

conduct was a superseding cause that eliminated his responsibility for the air collision."
(*Brady*, *supra*, 129 Cal.App.4th at pp. 1327–1328.) The court rejected these arguments on the ground CALJIC Nos. 3.41 and 8.56 and instruction No. 5 were correct statements of law because "a defendant whose conduct was a proximate cause of harm is not absolved of responsibility because another person's conduct, negligent or otherwise, is also a substantial or contributing factor in causing the harm. The act of another constitutes a superseding cause precluding responsibility of the initial actor only if the other's conduct is both unforeseeable and causes harm that was not the foreseeable consequence of the initial actor's conduct." (*Brady*, at p. 1328.) The court acknowledged, however, that other instructions, including CACI Nos. 431 and 432, may have provided greater clarity. (*Brady*, at pp. 1328–1329.)

### D. Analysis

Defendant challenges the court's special instruction on causation on several grounds. We address his contentions in turn.

Defendant first contends the instruction was erroneous because "the fourth and sixth paragraphs conflicted with the fifth paragraph and thereby precluded the jury from finding that if Maldonado bumped [defendant's] vehicle with his truck, Maldonado's act was an intervening superseding cause of the death of [Maria] and the injuries of the two minors." To reiterate, the challenged paragraphs are as follows:

> "If you find that a defendant's conduct was a cause of death or injury to another person, then it is no defense that the conduct of some other person contributed to the death or injury.

> "An intervening act may be so disconnected and unforeseeable as to be a superseding cause that, in such a case, the defendant's act will be regarded at law as not being a cause of the injury sustained.

> "It is not a defense to a criminal charge that some other person was guilty of negligence, which was a contributory cause of the death or injury involved in the case." (Highlighting omitted.)

38.

These instructions are nearly identical to those provided in *Brady*, which were determined to accurately state the law. The principles of intervening cause articulated in these instructions have been affirmed repeatedly, although not necessarily verbatim. (E.g., *Cervantes*, *supra*, 26 Cal.4th at p. 871; *People v. Fiu* (2008) 165 Cal.App.4th 360, 371; *People v. Hansen* (1997) 59 Cal.App.4th 473, 479.) Defendant does not contest that the instructions accurately state the law, but instead argues, based on *Brady*, that the instructions could have been more clear. He contends the court "should have been aware" that the instructions would have been more clear if they had included language from CACI Nos. 431 and 432. However, defendant did not request that CACI Nos. 431 and 432 be given. Defendant's contention that the court's legally correct instruction could have been better does not provide a basis for reversal. (See *People v. Thomas*, *supra*, 14 Cal.5th at p. 382.)

Defendant also contends the court's special instruction was inadequate because it "failed to adequately define an intervening act, and it did not instruct the jury that if it found an intervening act to be unforeseeable and the act caused harm that was a not foreseeable consequence of [defendant]'s conduct, it would be required to find that [defendant]'s conduct was not a contributing cause of the death and injuries sustained." However, the instruction explained that "[a]n intervening act may be so disconnected and unforeseeable as to be a superseding cause that, in such a case, the defendant's act will be regarded at law as not being a cause of the injury sustained." This is consistent with case law explaining that an intervening cause is one that is " ' "unforeseeable" ' " and " ' "an extraordinary and abnormal occurrence." ' " (*Cervantes*, *supra*, 26 Cal.4th at p. 871; see *Brady*, *supra*, 129 Cal.App.4th at p. 1329.) Furthermore, the jury was properly instructed on foreseeability. (*Cervantes*, at p. 871 [using language substantially similar to that included in the court's special instruction here].)

Defendant further contends the instructions were inadequate for failing to define the term "substantial factor." CALCRIM No. 620 and the causation paragraphs omitted

from the instructions on the offenses, which defendant argues the court should have given, define a "substantial factor" as one that is "more than a trivial or remote factor." Prior to the formulation of pattern jury instructions defining "substantial factor," courts held that no such instruction was necessary, inasmuch as the phrase was " ' "sufficiently intelligible to any layman." ' " (*Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508, 531; accord, *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052.) We therefore conclude that the failure to define "substantial factor" did not constitute error.

Defendant also argues generally that removing the relevant causation language from the individual instructions and combining various instructions into a single instruction was confusing. However, the court's special instruction itself informed the jury that it defined the types of acts that cause death or injury under the law. We presume the jury is capable of correlating the court's instructions and understanding the special instruction applied to offenses requiring the jury to find that defendant caused death or injury.

Finally, defendant contends the court should have given the pattern jury instructions contained in CALCRIM No. 620 and the causation paragraphs in the instructions on individual offenses because those instructions are legally correct and easier to understand. However, as defendant acknowledges, courts are not required to use pattern jury instructions (*People v. Thomas* (2007) 150 Cal.App.4th 461, 466), so long as the given instructions are accurate and understandable by jurors (Cal. Rules of Court, rule 2.1050(f)). Once again, defendant's contention regarding his preferred instructions does not rise to a claim of reversible error.

Considering the foregoing, defendant has not shown a reasonable likelihood that the jury understood the court's special instruction to foreclose consideration of whether Maldonado's alleged act of bumping the Mustang with the Ram constituted an intervening act that relieved defendant of criminal liability on the charged and included offenses. (See *People v. Thomas*, *supra*, 14 Cal.5th at p. 382.) Because we conclude

defendant has not shown error, we do not consider his argument that the error was not harmless.

## IV. Denial of Motion for Mistrial Based on Prosecutorial Misconduct[*]

Defendant contends the trial court violated his federal constitutional rights and state law in denying a joint defense motion for mistrial based on a comment made by the prosecutor during rebuttal closing argument. The People concede the prosecutor's statement was improper but harmless. We conclude the court did not abuse its discretion in denying the motion for mistrial.

### A. Additional Background

The prosecutor concluded his rebuttal closing argument as follows:

> "If [defendant and Maldonado] made the right choices, Maria [N.] doesn't die that day. But they didn't. They willingly chose to make the choices they did, and Maria [N.] paid for it with her life. And those kids, their bodies were broken bad because of these two men. [¶] *Don't forget that this case is about the victims in this case, as well, not just these two men. [Maria N.] is gone and a family is shattered because these men chose to disregard everyone else on that roadway.* They are guilty for murdering [Maria N.], and I urge you to find them so."

Outside the presence of the jury, defense counsel argued the prosecutor's argument was improper: "Your Honor, I believe there was improper argument by the prosecution when he indicated that this case is about the victims when the case is about the defendants themselves. And I don't believe . . . that is a proper argument for the jury to consider. I[] think it is the rights of the defendants that are at stake at this particular time." The court clarified that defense counsel was arguing the prosecutor had improperly appealed to the "emotions and sympathy of the jury," and defense counsel agreed. Defense counsel added that "there were some nods of the head when those statements were made, and I believe that there should be an admonishment to the jury

---

[*] See footnote, *ante*, page 1.

41.

that that is improper for them to consider in the process of making their decisions."
Counsel for Maldonado joined in defendant's counsel's argument. The court expressed
its willingness to admonish the jury and asked counsel to "think about what admonition
[he'd] like [the court] to make" and the court would revisit the issue the next day.

The following day, counsel for both defendants filed a joint motion for mistrial
and, in the alternative, submitted a proposed admonishment to the jury. The proposed
admonishment read: "During rebuttal, you heard an argument from the prosecutor
referencing concerns about Maria [N. and the two minor victims]. The victims in this
case are not on trial. The comments made by the prosecutor must not arouse your natural
sympathy for the victim or the victim's family and must not divert your attention from
your proper role in deciding the appropriate charge in this case. You should not be
guided by passion or sympathy regarding the victims, their injuries and their families.
Both [defendant] and Israel Maldonado must be afforded all Constitutional safeguards
throughout the deliberation process."

The court stated its tentative ruling to deny the motion and to admonish the jury
with its own admonishment. The court took the matter under submission and stated its
intent to allow the parties to make a further record on the motion for mistrial during jury
deliberations. The court admonished the jury as follows:

> "I just wanted to remind everyone of something that we have been talking
> about since jury selection. And I've instructed you on this subject. It's the
> subject of sympathy, anger, emotional feelings, things like that.
>
> "In one of the instructions I read to you, the first one I read to you,
> it's [CALCRIM] No. 200, it states, very clearly, you must not let bias,
> sympathy, prejudice or public opinion influence your assessment of the
> evidence or your decision.
>
> "And I think the way I approached this during jury selection is I
> discussed the fact that, in a trial, jurors may feel emotions. You may feel
> sympathy at some point or anger at some point or other emotions. And
> that's okay if you have those feelings. We're all normal human beings with

42.

a normal range of human emotions, but you cannot let those emotions or feelings influence your decision-making or your verdict.

"That means you have to work at regaining your composure, make sure that when it's time to make your decisions, when you're deciding what the facts are and deciding what the verdict should be, you're calmly focused on the evidence and the law and not letting those emotions that you felt earlier influence you.

"Another important concept that I'm going to be reading to you as part of these concluding instructions is that you must reach your verdict without any consideration of punishment. So you cannot discuss or consider, for any reason, the subject of penalty or punishment. That has nothing to do with your role as the triers of fact, the judges of fact.

"If there's ever any reason to consider penalty or punishment, that is my responsibility. You can't discuss it or consider it for my purpose.

"And then, finally, just to, again, make some points very clear, sympathy for alleged victims is not relevant to your process of deliberation or deciding the case. So, again, if there is some sympathy for alleged victims, you have to make a conscious effort to set that aside and not let it influence you in any way. Sympathy is not an appropriate thing for you to consider or be influenced by in reaching your decisions."

At the conclusion of the instruction, the court asked counsel whether there was "any reason for a sidebar with regard to the [c]ourt's admonition to the jury." The prosecutor and both defense counsel replied that there was not. Counsel for defendant stated, "No, Your Honor. Thank you. I'm satisfied."

The court later addressed the mistrial motion outside the presence of the jury. Defense counsel stated he had observed a juror nodding his head and rocking his seat back and forth during the prosecutor's rebuttal argument. He observed several other jurors nodding their heads up and down as well. Defense counsel interpreted this as the jurors giving credence to the prosecutor's argument and affording sympathy to the victims. The prosecutor confirmed that he observed the juror rocking back and forth in his chair but did not observe any jurors nodding their heads. The court stated it did not see anything out of the ordinary and, in any event, "trying to interpret body language can

be very difficult, and is not a reliable way to know what jurors are actually thinking or what their intentions are." The court declined to find that the jurors were behaving in such a way as to convey they felt sympathy for the alleged victims that would create an unreasonable risk they would allow such sympathy to guide their verdicts. The court stated its belief that the admonition, which was consistent with other instructions given throughout trial, "put . . . to rest" concerns that the jurors would be guided by sympathy. Accordingly, the motion for mistrial was denied.

## B. Applicable Law

We review a ruling on a motion for mistrial for abuse of discretion. (*People v. Schultz* (2020) 10 Cal.5th 623, 673 (*Schultz*).) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*Ibid.*; see *People v. Bell* (2019) 7 Cal.5th 70, 121.) " '[A] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . .' " (*Schultz*, at p. 673.)

" ' "[T]he applicable federal and state standards regarding prosecutorial misconduct are well established." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) " 'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" [Citation.] The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citation.] ' "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the

defendant would have been reached without the misconduct." ' " (*People v. Young* (2019) 7 Cal.5th 905, 932–933.) " ' "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*Ayala*, at p. 284.) To the extent the court admonished the jury regarding the prosecutor's comment, "[w]e presume that a jury follows the court's admonishments." (*Schultz*, *supra*, 10 Cal.5th at p. 673.)

### C.     Analysis

The People acknowledge that the prosecutor's comment regarding the victims and their families was improper. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 [improper for prosecutor to appeal to jurors' sympathy for the victim]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1193 [improper for prosecutor to comment on the impact of the crime on the victim's family].) We accept the People's concession and consider whether the comment was prejudicial. We conclude it was not. Accordingly, we conclude defendant's chances of a fair trial were not irreparably damaged, and the court therefore did not abuse its discretion in denying a motion for mistrial.

We first address defendant's contention that the prosecutor's improper argument rendered his trial fundamentally unfair by lessening the prosecutor's burden of proof and we therefore must consider whether the argument was harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. at page 24. We conclude the prosecutor's argument did not render the trial so fundamentally unfair that it triggered the *Chapman* standard. The prosecutor made a single improper statement appealing to the jury's sympathy for the victims and their families, but the court instructed the jury, both before and after the statement, that bias and sympathy were to play no role in their deliberations. We assume the jurors followed the court's instructions.

45.

For the same reasons, we also conclude it is not reasonably probable that a more favorable result would have been reached absent the prosecutor's statement. Additionally, we note that, although defendant proffered his own admonition, he did not object to the admonition given by the court. Nonetheless, he now argues the admonition given by the court was inadequate to cure the prejudice arising from the prosecutor's comment because it was given 19 hours after the improper argument. He contends this allowed the jurors time to "think about the victims and the impact of the accident on their families which likely made it impossible for the jury to set aside their sympathy for the victims and their families during deliberations." He also points out that the prosecutor's statement was made as part of the prosecutor's concluding remarks, which the defense had no opportunity to rebut.

The prosecutor's improper statement was made at the conclusion of his rebuttal argument, immediately before the jury was excused for the day. Prior to being excused, the jury was instructed: "[T]onight, don't be thinking about the case. You're going to go home and get a good night's rest. You will only start thinking about the case and trying to decide what the facts are when the 12 of you are in the jury room tomorrow." The court's admonition regarding bias and sympathy was given the following morning, before the jury received its final instructions and began deliberations. We presume the jurors followed the court's instructions, including the instruction to refrain from deliberating until it was in the jury room the following day. We therefore disagree with defendant's assertion that the delay between the prosecutor's comment and the court's admonition allowed the jurors an excess of time in which to consider any sympathy that may have arisen for the victims.

Defendant also contends the court's admonition was inadequate because it did not directly mention the prosecutor's improper remark or inform the jury that the remark was improper. Additionally, the admonition did not specifically state that sympathy for the victim's *family* was an improper consideration for the jury. However, the court's

46.

admonition informed the jury, "[Y]ou must not let bias, sympathy, prejudice or public opinion influence your assessment of the evidence or your decision." Although the court later specifically informed the jury, "[S]ympathy for alleged victims is not relevant to your process of deliberation or deciding the case," we assume the jurors were capable of correlating and understanding the court's repeated instructions, which prohibited them from relying on sympathy in deciding the case. Nothing in the record suggests the prejudicial effect of the prosecutor's argument could not be cured by the court's directive.

Finally, defendant points out that, in denying the motion for mistrial, the court was unpersuaded by defense counsel's assertion that some jurors were nodding their heads during the prosecutor's argument. The court stated that body language "is not a reliable way to know what jurors are actually thinking or what their intentions are," but that the court in any event did not "see anything out of the ordinary." On that basis, the court declined to find the jurors were behaving in an "unusual" or "improper" way that would reflect sympathy for the victims or create an unreasonable risk that sympathy would guide their verdicts. Regardless, the court determined that its admonition "put that to rest." Again, the court is vested with broad discretion in addressing a motion for mistrial. We cannot say the court abused its discretion in determining that the admonition was sufficient to alleviate any concern that the prosecutor's comment could affect defendant's right to a fair trial.

In sum, because any prejudice arising from the prosecutor's comment could be cured by the court's admonition to the jury, we conclude defendant's right to a fair trial was not irreparably damaged, and the court did not abuse its discretion in denying the motion for mistrial.

47.

## **DISPOSITION**

The judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

DE SANTOS, J.